UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

_RAMON MONTAGUE_

_____

_____

(Enter above the full name
of the plaintiff or plaintiffs in
this action)

vs.

_TERRY WILLIAMS, MICHEAL LEMKE,_

_JOHN LUTZINGER, JAMES_

_LOUCH, TROY JOHNSON, Michael_

_Studek, John Doe,_

_____

_____

(Enter above the full name of ALL
defendants in this action. Do not
use "et al.")

RECEIVED

FEB 2 5 2016 _EMG_
2-25-16
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

16-cv-2609
Judge Rebecca R. Pallmeyer
Magistrate Judge Maria Valdez
Case No: _____PC4_____

(To be supplied by the Clerk of this Court)

CHECK ONE ONLY:

___✓___  COMPLAINT UNDER THE CIVIL RIGHTS ACT, TITLE 42 SECTION 1983
U.S. Code (state, county, or municipal defendants)

_____  COMPLAINT UNDER THE CONSTITUTION ("BIVENS" ACTION), TITLE
28 SECTION 1331 U.S. Code (federal defendants)

_____  OTHER (cite statute, if known)

_BEFORE FILLING OUT THIS COMPLAINT, PLEASE REFER TO "INSTRUCTIONS FOR
FILING." FOLLOW THESE INSTRUCTIONS CAREFULLY._

I.    **Plaintiff(s):**

A.    Name: _____ Ramon Montague _____

B.    List all aliases: _Rico Mac, Ricardo Montague, Rico Montay. etc._

C.    Prisoner identification number: _N62212_

D.    Place of present confinement: _Stateville Correctional Center_

E.    Address: _P.O. Box 112 Joliet, Illinois 60434_

(If there is more than one plaintiff, then each plaintiff must list his or her name, aliases, I.D. number, place of confinement, and current address according to the above format on a separate sheet of paper.)

II.   **Defendant(s):**

(In A below, place the full name of the first defendant in the first blank, his or her official position in the second blank, and his or her place of employment in the third blank. Space for two additional defendants is provided in **B** and **C**.)

A.    Defendant: _____ Terry Williams _____

      Title: _____ Warden _____

      Place of Employment: _Stateville C.C._

B.    Defendant: _Michal Lemke_

      Title: _Ex-Warden_

      Place of Employment: _Stateville C.C._

C.    Defendant: _John Lutzinger_

      Title: _Ex-Chief Engineer of Stateville C.C._

      Place of Employment: _Stateville Correctional Center_

(If you have more than three defendants, then all additional defendants must be listed according to the above format on a separate sheet of paper.)

Cont. Pg. 2-B

Revised 9/2007

CONTINUED FROM PAGE 2.

D. Defendant: JAMES Louch
Title: Ex-Chief Engineer
Place of Employment: Stateville Correctional Center

E. Defendant: Troy Johnson
Title: Chief Engineer
Place of Employment: Stateville Correctional Center

F. Defendant: John DOE
Title: Safety and Sanitation Coordinator
Place of Employment: Stateville Correctional Center

G. Defendant: Micheal Studer
Title: Water supply Operater
Place of Employment: Stateville Correctional Center

III. List ALL lawsuits you (and your co-plaintiffs, if any) have filed in any state or federal court in the United States:

A. Name of case and docket number: RAMON Montague v. Wexford Health Sources Inc, 11-C-5080

B. Approximate date of filing lawsuit: On or about April of 2011

C. List all plaintiffs (if you had co-plaintiffs), including any aliases: NONE

D. List all defendants: Wexford Health Sources Incorporated, Dr. Partha Ghosh, Dr. Liping Zhang, PA LaToya Williams, Warden Marcus Hardy, Sherry Benton, Gladyse Taylor, Arthur Funk, Louis Shicker, Safety and Sanitation Coordinator

E. Court in which the lawsuit was filed (if federal court, name the district; if state court, name the county): Northern District of Illinois Eastern Division

F. Name of judge to whom case was assigned: George M. Marovich

G. Basic claim made: Deliberate Indifference and Systematic Delays of Specialty Referral Services

H. Disposition of this case (for example: Was the case dismissed? Was it appealed? Is it still pending?): The district court dismissed the case. The Appellate Court Affirmed.

I. Approximate date of disposition: date of dismissal: July 2 2014; Appellate Court Affirmed: September 25, 2015

IF YOU HAVE FILED MORE THAN ONE LAWSUIT, THEN YOU MUST DESCRIBE THE ADDITIONAL LAWSUITS ON ANOTHER PIECE OF PAPER, USING THIS SAME FORMAT. REGARDLESS OF HOW MANY CASES YOU HAVE PREVIOUSLY FILED, YOU WILL NOT BE EXCUSED FROM FILLING OUT THIS SECTION COMPLETELY, AND FAILURE TO DO SO MAY RESULT IN DISMISSAL OF YOUR CASE. CO-PLAINTIFFS MUST ALSO LIST ALL CASES THEY HAVE FILED.

Revised 9/2007

CONTINUED FROM PAGE 3.

A. Name of case and docket number:

B. Approximate date of filing lawsuit:

C. List all plaintiffs (if you had co-plaintiffs), including any aliases:

D. List all defendants:

E. Court in which the lawsuit was filed:

F. Name of judge to whom case was assigned:

G. Basic claim made:

H. Disposition of this case:

I. Approximate date of disposition:

NOTE: I CAN'NOT RETRIVE THE REQUIRED INFORMATION
    TO FILL OUT THIS PORTION OF THE FORM... IT
    SHOULD BE A MATTER OF THE RECORDS!

IV.    Statement of Claim:

State here as briefly as possible the facts of your case. Describe how each defendant is involved, including names, dates, and places. **Do not give any legal arguments or cite any cases or statutes.** If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. (Use as much space as you need. Attach extra sheets if necessary.)

## NATURE OF ACTION

1. This is a civil action brought pursuant to the Eighth and Fourteenth Amendment of the United States Constitution, to seek monetary, declaratory and injunctive relief under 42 U.S.C. §1983, and to redress deprivations of plaintiff's civil rights which were precipitated by the unlawful cruel and unusual punitive acts and omissions of the defendants, all while purporting to act under the color of law.

## JURISDICTION AND VENUE

2. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 and 1343 (a)(3).

3. VENUE, is proper pursuant to 28 U.S.C. 1391 (b)(2), in the United States District Court for the Northern District of Illinois because the facts giving rise to the claims in this complaint occurred in this district.

4

## ADMINISTRATIVE REMEDIES

4. Plaintiff has exhausted all administrative remedies "available" in this matter, but none of Plaintiffs requests for relief, were remedied... The problems Plaintiff sought relief for, still exist at the date of this filing.

5. Plaintiff Ramon Montague, 57 years old, a male of African-American descent... A citizen of United States, thats currently incarcerated at the Stateville Correction Center, P.O. Box 112 Joliet, Illinois 60434, under the register number: N62212

## COUNT 1 - UNSANITARY BIRDS AND VERMIN

6. Stateville Correctional Center has had an extensive history of unsanitary birds and vermin within the inmates living quarters, as well as in the chow-hall. (dietary/Kitchen)

7. Defendants Williams, Lemke, Lutziner, Louch, Johnson, and John Doe, have known of these problems for several years without attaining comprehensive remedial measures to adequately address and subdue the unsanitary birds and vermin.

8. Plaintiff has on numerous occasions complained to Stateville officials, as well as the officials in Springfield, regarding the wild birds flying around the chow-hall while inmates are eating, dropping bird feces wherever the birds please, while simultaneously chirping. (See Ex. 1-3)

9. Plaintiff filed his initial complaint/grievance regarding the unsanitary birds on January 2, 2013. I was informed: "that every effort is made to ensure wildlife do not enter the living units; however, from time to time this does occur due to doors and windows in the units. (living quarters) When this does occur staff ensures appropriate departments are notified to get rid of wildlife." (See Ex. 1-3) NOTE: The problem of the birds flying around in the chow-hall was never addressed.

10. The wildlife birds carry various communicable diseases, through the bird itself, as well as bird feces, such as bird flu, lice, mites, parasites, spores and various toxins, all of which can cause varying human bodily injury. (See Ex. 1-3)

6.

11. The large population of birds that were nesting in Delta house, where Plaintiff live, presents a disease risk. The most serious health risk arises from disease organisms that grow in accumulation of bird droppings. (See ex. 4a, b, c.)

12. There are several fungal diseases from birds/bird droppings, such as:

(a) Histoplasmosis: Histoplasmosis is caused by a fungus.

The disease is transmitted to humans by airborne fungus spores from droppings of birds. (See ex. 4b)

(b) Psittacosis: Psittacosis is a rare infectious disease that affects various birds.

When bird droppings dry and become airborne, people may inhale them and get sick. In humans, this bacterial disease is characterized by fatigue, fever, headache, rash, chills, and sometimes pneumonia. (See ex 4b)

(c) Allergic Alveolitus: Allergic Alveolitus is an airborne disease, that can be contracted in humans by inhaling particles of bird dander. (See ex. 4a)

(d) Avian Influenza: Avian Influenza is transmitted through coming into contact with fecal matter of birds that are infected. (See ex. 4a)

(c) Campylobacteriosis: Campylobacteriosis is a bacterial infection that causes gastrointestinal problems.

13. Plaintiff avers that he has suffered from fatigue, fever, headaches, and chills, but did not catch pneumonia. Of which Plaintiff was seen for, and treated. (See ex. 15, 15b)

14. Plaintiff further avers that due to the birds nesting in his living unit, he suffers annoyance, as well as deprivation of peace of mind, where Plaintiff would experience every morning for Months, birds chirping and singing in his cell and/or on the gallery will be fighting over food or territory. (See ex. 1 pgs 2-4)

15). Plaintiff also avers that Delta house has a vermin infestation thats not controlled at all, where mice roam in and out of inmates cells regularly and on a daily basis. (See ex. 1 pgs 2-4)

16). Plaintiff has had mice in his cell, where they have eaten food that was purchase from the inmate commissary, of which was stored properly in his personal property box. As is required to be in compliance with stateville c.c. policies. The mice have also eaten through Plaintiffs clothes, that were issued by the prison.

17). Defendants Lemke, Williams, Johnson, Letziner and Louch are/were well aware of the complaints that have been included but not limited to Plaintiffs, that has been made regarding the birds and vermin, but they all have failed to correct any of them. (This include John Doe)

8.

COUNT 2 - TOXIC MOLD

18. Stateville has had a bad history with mold, where it not only affected inmates, but correctional officers as well, not only has Plaintiff complained of the mold problem, but Correctional officer were warned of certain areas where they should be aware, and to avoid as far as their work assignment. (See Ex 5, 6) These issues were not only complained of to the administration at Stateville C. C., but Illinois Department of Corrections as well.

19. Defendant John Doe, as the Safety and Sanitation Coordinator, has know of this problem for many of years, even before Defendant Williams; nevertheless, despite having knowledge of the unhealthy mold problems, Defendants Williams, Learke, and John Doe, have failed to correct these problems. (See Ex 5, 6)

20. The toxic mold has side effects that include: delayed reactions, and these results from almost daily exposes, building up over time and can range from neurological damage to the risk of cancer from exposure to certain mold toxins in the air and water. (See Ex. 7 pgs 1-4)

21. Inmates and staff at Stateville have made Defendant Williams, and John Doe, aware continuously of how the roofing in the four units (cell houses) leak whenever it rains, the roof leaks massively, to the point buckets and trash containers have to be lined up to attempt

9.

to catch water that is leaking from the ceiling,
but puddles of water still form because the leaks are so
Massive.

22. The water leaks are in various buildings within Statville,
where a Massive amount of Mold is produced as well, the rooks
that leaks that Plaintiff was exposed to:

(1) Delta House      (5) School building    (9) Gym
(2) Frank House      (6) Clothing room
(3) Charlie House    (7) Commissary
(4) Law Library      (8) Personal Property

23. The roofs of all these buildings have had cave ins, ceiling
falling on inmates. In some case buildings have so much Mold
that staff complained to the department of health (see Ex. 6) where a
staff member suffered an allergic reaction to the mold and the
Department of Health found the building unsafe and orders that staff
members be reassigned this was the school building, which is the
same building as the law library where Warden (Assistant) Colloway.
wrote a letter stating there was mold on the legal books (see ex. 5).
This very same assistant warden ordered book cases of legal books to be
thrown away due to them being covered with toxic mold, book shelfs
that Now sit empty, and forces inmates to pay for cases from the thrown
away books, to be copied.

24. The clothing room roof collasped, causing it to be relocated
in another building.

10.

COUNT 3 - INADEQUATE/CONTAMINATED WATER SUPPLY

25. Stateville has had a bad history of supplying inadequate/contaminated water to its employees and inmates, where hundreds of inmates have continuously complained of these issues to the administration of Stateville and/or Illinois Department of Corrections.

26. Defendant Micheal Studer, as the water supply operator, has known of this problem for many of years, even before Defendant Williams; nevertheless, despite having knowledge of the inadequate and/or contaminated water supply, Defendant Williams, Lemke, and Studer, John Doe, have failed to correct these problems. (See Ex.8, 9a,b.c, 10)

27. The inadequate/contaminate water supply at Stateville is for inmate drinking and for their cooking of all foods prepared by the Diety/Dietary/Kitchen. (See Ex. 11a,b,c,d,e)

28. This inadequate/contaminated water supply consist of excessive amounts of microbial contaminants, such as viruses and bacteria, inorganic contaminants, such as salts and metals, pesticides and herbicides, such as various water runoffs, organic chemical contaminants, including synthetic and volatile organic chemicals, which are byproducts of industrial processes and petroleum production, and radioactive contaminants. (See Ex 12 (a) (b) (c))

11.

29. One specific contaminant in Stateville is radium, which when water containing combined radium is ingested, a portion of the radium may remain in the bone. And the radiation which is given off from the radium due to its high energy, can cause damage to surrounding tissue. And, a dose of 5 pC:/1 ingested over an extended period of time may result in the development of bone cancer. (See Ex. 8-9 a,b,c)

30. Another contaminant in Stateville is Alpha Emitters, which are arosions of natural desposits. and is also a cancerous element. (See Ex. 9 a,b.c)

31. Stateville does not have a cross-connection control program approved by the Illinois Environment Protection Agency. And Defendant Studer, has not assured that all the back flow devices are tested on an annual basis. Defendants: Lemke, and Williams. have not assured testing either. (See Ex. 13 a,b,c)

32. Stateville supply water, is contaminated with exceeding levels of lead and copper, as well as unisolated softner (TP&W). has produced stagnant and contaminated water entering the distribution. (See Ex. 11a, 13 b)

33. Defendants Studer, Williams and Lemke knew that Stateville had a supply which had a water softener which was not being used, in which the stagnant water and/or the unused filter media inside the softener allowed harmful bacteria breeding and distribution to Plaintiff. Defendant Studer, Lemke, and Williams have failed to fix the problem.

34. These same bacteria and contaminants are utilized by the Stateville Dietary in the preparation of foods and drinks, that are consumed on a daily basis by Plaintiff. These bacteria and contaminants have caused Plaintiff to suffer various ailments, where since Plaintiff's arrival at Stateville in the year of 2006 to the present, Plaintiff's health has gradually deteriorated, to the point he not only caught H. pylori (a stomach bacteria) he's recovery from colon cancer, and the removal of a large portion of his lower colon. (See Ex. 16)

34. That during 2006 and after, Plaintiff has ingested, through the Stateville C.C. water supply; combined Radium 226, 228 excessive levels of lead, Beta Photons, Alpha Emitters, and other harmful Radioactive contaminants which are known to the scientific community to be Carcinogens (cancer causing elements). This constitutes cruel and unusual punishment in violation of the Safe Water Act of 1972 and the 8th Amendment, as well as the 14th Amendment of the United States Constitution.

35. Defendants Zerike, Williams, and Studer, were made aware by the "Notice" from the Illinois Environment Protection Agency ( See Ex. 14.(a) ) that the Radium in Stateville C.C. water system, had exceeded established limits, and that drinking the water during these times could result in the development of bone cancer, as well as other Carcenogens. Yet the aforementioned Defendants, fail to warn Plaintiff, along with the other inmates at Stateville C.C., of this dangerous time of high contamination and failed to provide Plaintiff with safe uncontaminanted water for consumption, as they did the staff during those times. All of the food and water that Plaintiff consumed during those times, had the Radioactive Carcenogens, without a warning from the Defendants. ( See Ex. 14 (b) )

36. Defendant Williams, and all of the wardens before him during the years of 2006 and up until warden Williams, fail to switch too a completely uncontaminated water source before 2006 and after 2015 caused Plaintiff to ingest, through Stateville C.C. water supply system, excessive levels of known Carcenogens. This exposure and ingestation of excessive levels occurred for long periods of time, years after years. (See Ex. 11, 13. (a) (b) ).

). A brief list of when said water had unconstitutional levels of Carcenogens were:

9/1/2000 to 9/30/2002

10/1/2002 to Ongoing

1/1/2003 to 3/31/2003

14.

4/1/2003 to 6/30/2003

7/1/2003 to 9/30/2003

10/1/2003 to 12/13/2004

7/1/2004 to 8/31/2004

10/1/2004 to 12/31/2004

4/1/2004 to 6/30/2004

(See Ex. 8-14)

37. These aforementioned Defendants, deliberately endangered Plaintiff health and safety by causing these Carcenogens to penetrate Plaintiff's bones and other vital organs, while acting under color of the law in his individual capacity.

38. As a direct result of defendants actions and inactions, Plaintiff has consumed Carcenogens for years in his food and in his drinking water, without medical treatment. This constitutes "gratuitious cruelty" while Defendants were being deliberately indifferent to Plaintiff's plight, they could have caused his untimely death.

39. These Defendants jointly and individually promulgated these conditions that violated Title IV of the Illinois Environmental Protection Agency/Act. 415 ILCS 5/1-57, 17 (1999) (the Act), 35 Illinois Administrative Code 35 IAC. (See Ex. 8.9ab)

15.

40. These Defendants jointly and individually refused to prepare and file Monthly operating reports with the "Certified Operator in Responsible Charge" for the years between 1998 to 2011. Those complete reports were to have daily water usage, calculated and measured chlorine residuals to have been submitted at the end of each month under the Environmental Protection Act, Section 19: and 35 IAC 611. 831 in violation of Plaintiff 8th and 14th Amendment rights: and as such this constituted cruel and unusual punishment.

41. Defendant Tarry Williams, (along with all the other wardens that were in office during this span of constitutional violations) is the Chief Administrator Officer at the Stateville Correctional Center, and as such, upon entering this position of authority he was made personally aware of, and became responsible for Stateville's Administrative/Managerical capacity - cross-connection control program deficiancy.

42. Stateville C.C. do not have a cross connection control program approval by the Illinois EPA. (See Ex.13(a)) Stateville C.C. adopted a cross connection and backflow protection policy. (See Ex.13(a)) Defendant warden Williams, have not been ordering the annual testing of all back flow devices. Nor does Stateville C.C. maintain records of all tests and location of all RPZ type backflow devices. (See Ex.13:a)

16.

This violates the Act Section 18, 35 IAC, Section 653,801 and 652,802 and constitutes deliberate indifference to Plaintiff's health and safety needs.

43. Stateville water supply system has a softner which in the past, and currently is not being used. (See Ex.13(b)) This has caused stagnant water and/or unusual filter media inside the softner to allow bacteria breeding, which is contaminating water entering the distribution. Further, Stateville does not use the softner, but refuses to physically disconnect it from the system: this breach caused Plaintiff to drink stagnant water that was contaminated. This is a persistant and ongoing problem that Defendant Williams, and the other wardens, refused to correct while acting under color of the law in his individual capacity.

44. Stateville C.C. current water system exceeds the Radionuclide Standard which allows unsafe levels of Carcenogens into the drinking water. Stateville C.C. has not aggressively explored treatment options such as:

a). Install mehinical treatment to remove the Radionuclide from the water. Instead, Plaintiff is forced to continue to drink, and cook with the contaminated water until harmful levels of Radium 226 and 228 naturally reduce with time.

17.

b). Blend high-level Radionuclide water low-level Radionuclide water.

c). Connect to another local water supply free from contaminants.

d). Drill new Radionuclide "free wells"

e). Use certain water softners, ion exchange, or reverse water treatment systems.

45. Under the 8th Amendment, the state is obligated only to provide sentenced prisoners with adequate shelter, food, sanitation. Medical care and personal safety. Rhodes v. Chapman, 452 U.S. 237, 101 S.ct. 2392, 69 L. Ed 2d 59 (1981). Plaintiff in this current § 1983 claim. alleges that the contaminated water, and other living conditions aforementioned. has led to the deprivation of all those necessities of life. reducing them to the point where they have fallen below the minimum 8th Amend. Standard. Defendant warden Williams is subjecting aware of Plaintiff's living conditions and disregards the excessive risk that failure to correct these conditions of confinement, pose to Plaintiff's health and safety. This violates the citizen standards of human decincy and inevitably lead to a wanton and deliberate infliction of pain through inaction when defendant had the power and authority to order the required repairs and changes but refused to do so

## COUNT 4- TOXIC LEAD PAINT

46. Stateville has had a bad history with toxic lead paint, and the defendants has intentionally failed to correct the problem of the toxic lead paint in plaintiff cell, as well as all the buildings Plaintiff frequent often, which poses a serious health risk.

47. The Defendants has intentionally failed to address the problem of the many places where condensation pockets have formed from water leaking through the walls, and patches of paint have blistered and fallen away leaving every layer of paint applied throughout the years to the walls exposed; which in turn, exposed the Plaintiff to the many layers of old toxic paint. Especially, but not limited to; Lead Acetate: a poisonus crystalline compound used in water proofing and various varnishes and mixed with or applied over paint to produce a gloss effect...

Lead Carbonates: A poisonus white amorphous powder used as pigment.

Lead Chromate: A poisonus yellow crystalline compound used as a paint pigment.

<u>Barium Sulfate</u>: A poisonus fine white powder used as pigment or filler paint.

<u>Cadmium</u>: A poisonus soft metalic element used as a filler in paint.

48. All of which have been scientifically proven to cause cancer and many other serious health risks, such as <u>Painter Colic</u>. Which is chronic intestinals pains and constipation caused by lead poisoning. So called because the disease is often caused by exposer to lead based paint... Plaintiff was diagnosed with colon cancer in 2011, two years after complaining of blood in his stool, weight loss, pain in his stomach, and not being able to keep food down. Had it not been for Plaintiff relentless pursuit of the cause for his constant pain, and weight loss, Plaintiff would have dead, as so many others has done, and are still doing.

49. In some places the paint has peeled away to expose colonies of toxic black mold, (in inmates showers, cells, chow-hall and law library) which is harmful and/or fatal if ingested, inhaled or exposed to for a prolonged periods of time.

50. Those old layers of paint that the Defendants intentionally refused to correct, after being made aware of the problem, are extremely flamable and the fumes from them, if they catch fire, are extremely toxic and will cause serious injury and death if inhaled. Plaintiff has a constitutional right not to be exposed to lead based paint, Mold, and radon - and has developed an uncontroable cough, and at one point constant shaking, sweating and chills to his very bones, that was explained away as possible symptoms of mold, and a virus that's going around this prison.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

51. Plaintiff filed a grievance with his counselor in 2013 (J. Jefferson) of January. She responded January 16, 2013.

52. Plaintiff appealed the unfavorable decision to the grievance officer, who did not respond in a timely fashion.

53. Plaintiff appealed to the Administrative Review Board, who response was my grievance was not timely.

54. Plaintiff filed again Feberuary 28, 2015 to Warden Tarry Williams, as an emergency grievance, that was denied as being an emergency grievance. (See Ex.2.)

55. Plaintiff appealed to the Administrative Review Board, who ruled that my grievance fail to comply with DR 504. 810. (See Ex.3 pg.2)

## VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS

56. Plaintiff alleges by reference Paragraph 1-through-55 of this Complaint.

57. Plaintiff has rights protected under the 8th and 14th Amendment to the United States Constitution. These rights include the right to be free from cruel and unusual punishment, due process and equal protection of laws.

58. Plaintiff has exercised his constitutional protected right to be free from cruel and unusual punishment, due process and equal protection of laws, by the filing of this law suit.

59. As outlined above, Plaintiff has clearly exhausted his administrative remedies by filing his grievances, and followed the administrative procedure, through the internal grievance process, as well as the SDOC grievance process.

60. Defendant John Doe, current Safety and Sanitation Coordinator of Stateville, acting under the color of law, has violated the Plaintiff's Eighth and Fourteenth Amendment protected rights to be free from cruel and unusual punishment, when Defendant Doe acted deliberately indifferent to the Stateville Prison conditions that are inadequate and hazardous to Plaintiff's health.

61. Defendant Micheal Lemke, current Warden of Stateville, acting under the color of law, has violated Plaintiff Eighth and Fourteenth Amendment protected rights to be free from cruel and unusual punishment, when Defendant Lemke acted deliberately indifferent to the Stateville prison conditions that are inadequate and hazardous to inmates' health.

62. Defendant Tarry Williams, current Warden of Stateville, acting under the color of law, has violated Plaintiffs Eighth and Fourteenth Amendment protected rights to be free from cruel and unusual punishment, when Defendant Williams, acted deliberately indifferent to the Stateville prison conditions that are inadequate and hazardous to Plaintiffs' health.

63. Defendant Michal Studer, current Water Supply Operator of Stateville, acting under the color of law, has violated the Plaintiffs Eighth and Fourteenth Amendment protected rights to be free from cruel and unusual punishment, when Defendant Studer acted deliberately indifferent to Stateville Prison conditions that are inadequate and hazardous to Plaintiffs health.

64. Defendant John Lutzinger, Chief Engineer of Stateville, acting under the color of law, violated Plaintiffs Eighth and Fourteenth Amendment protected rights to be free from cruel and unusual punishment, when Defendant Lutzinger acted deliberately indifferent to the Stateville Prison conditions that are inadequate and hazardous to Plaintiffs health.

65. Defendant James Louch, Chief Engineer of Stateville, acting under the color of law, violated Plaintiff's Eighth and Fourteenth Amendment protected rights to be free from cruel and unusual punishment, when Defendant Louch acted deliberately indifferent to the Stateville Prison conditions that are inadequate and hazardous to Plaintiffs health.

66. Defendant Troy Johnson, current Chief Engineer of Stateville, acting under the color of law, has violated Plaintiff's Eighth and Fourteenth Amendment protected rights to be free from cruel and unusual punishment, when Defendant Johnson acted deliberately indefferent to the Stateville Prison conditions that are inadequate and hazardous to Plaintiff's health.

67. These prison officals have violated this deuty and responsibility of protecting Plaintiff from these inadequate and hazardous prison conditions.

68. These Defendants possess actual Knowledge of the inadequate and hazardous conditions, and have impeded the preventable Measures of harm.

69. These Defendants possess the power to correct all of the inadequate and hazardous prison conditions Plaintiff has alleged in this Complaint, at any given time, with a posture of diligence when evaluating job descriptions.

## CONCLUSION

WHEREFORE, PLAINTIFF RAMON MONTAGUE ask this Honorable Court for against Defendants, and states as follows:

1) a Declaration that the acts and omissions of Defendants violated Plaintiff's constitutional protected rights;

24.

2.). A Permanent Injunction prohibiting Defendants in further deliberate indifferent acts against: Plai...

3). Compensatory damages in the amount of Ten Thousand Dollars, ($10,000,00) to Plaintiff;

4.) Punitive damages in the amount of Five Thousand ($5,000,00) Dollars to Plaintiff;

5.) Damages for physical and mental suffering in the amount of Five Thousand ($5,000.00) Dollars, to Plaintiff;

6.) Plaintiff's cost and fees in prosecuting this action.

Dated 11/9/15

25.

V.    **Relief:**

State briefly exactly what you want the court to do for you. Make no legal arguments. Cite no cases or statutes.

_SEE CONCLUSION_

VI.    The plaintiff demands that the case be tried by a jury.    ☑ YES    ☐ NO

### CERTIFICATION

By signing this Complaint, I certify that the facts stated in this Complaint are true to the best of my knowledge, information and belief. I understand that if this certification is not correct, I may be subject to sanctions by the Court.

Signed this __10__ day of __NOV__, 20 __15__

_Ramon Montague_
(Signature of plaintiff or plaintiffs)

_Ramon Montague_
(Print name)

_N 62212_
(I.D. Number)

_P.O. Box 112_
_Joliet, Illinois 60434_
(Address)

D 333

EXHIBIT 2.

ILLINOIS DEPARTMENT OF CORRECTIONS
**OFFENDER'S GRIEVANCE**



1 of 6

| Date: 2-28-15 | Offender (Please Print) Ramon Montague | ID#: n62212 |
|---|---|---|
| Present Facility: Stateville C.C. | Facility where grievance issue occurred: Stateville C.C. | |

**NATURE OF GRIEVANCE:**

- [ ] Personal Property
- [ ] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Mail Handling
- [ ] Dietary
- [ ] Transfer Denial by Transfer Coordinator
- [ ] Restoration of Good Time
- [ ] Medical Treatment
- [ ] ADA Disability Accommodation
- [ ] HIPAA
- [x] Other (specify) _____

- [ ] Disciplinary Report: ____/____/____
  Date of Report          Facility where issued

Note:    Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
    Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
    Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
    Chief Administrative Officer, only if EMERGENCY grievance.
    Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary
    administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief
    Administrative Officer.

Summary of Grievance (Provide information including a description of what happened, when and where it happened, and the name or identifying information
for each person involved):

Grievant Ramon Montague, is filing this grievance on an emergency
basis, directly to Jarry Williams Warden of Stateville C.C., under
20 Ill. Admin. Code § 504.840. ( Thornton v. Snyder, 428 F. 3d 690).
    Due to the; unsanitary, unhealthy, andes unsafe condition
of my imprisonment, that has contributed to an environment
that's subceptable to all type of illnesses, encluding but not
limited cancer.
    While eatting in the chowhall here at Stateville C.C., I
observed the unsanitary and unhealthy condition of the chow

Relief Requested: See page 6

[x] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

| Ramon Montague | n62212 | 2-28-15 |
|---|---|---|
| Offender's Signature | ID# | Date |

(Continue on reverse side if necessary)

---

**Counselor's Response (if applicable)**

Date Received: ____/____/____

[ ] Send directly to Grievance Officer      [ ] Outside jurisdiction of this facility. Send to
                                                Administrative Review Board, P.O. Box 19277,
                                                Springfield, IL 62794-9277.

Response: _____

**RECEIVED**

MAR 20 2015

**ADMINISTRATIVE**
**REVIEW BOARD**

Print Counselor's Name          Counselor's Signature          Date of Response

---

**EMERGENCY REVIEW**

Date Received: 3/13/15

Is this determined to be of an emergency nature?
[ ] Yes; expedite emergency grievance
[x] No; an emergency is not substantiated.
Offender should submit this grievance
in the normal manner.

Jarry Williams HB      3/13/15
Chief Administrative Officer's Signature          Date

hall, and the prison as a whole... First: going through the chowhall circle were the food is put on the trays, every time I grab a tray, there's food particules on them, I have bring some thing to clean them off before allowing the food to be placed on my tray. Going into the sitting area to eat, birds are flying around, and often drop defecation as they fly by. (They are in the cellhouse as well).

I was informed by several of the inmates that work in the chowhall, that the trays were being cleaned by hand because the machine was not working, and they get backed up, and cannot clean all of the trays properly, so they just put them back on the line, and keep it moving.

The birds carry communicable diseases through their defecation, such as: bird flu, fungi, lise, parasites and various other toxic disorder, all of which do cause humans bodily injuries. This presents a health risk that arise from disease organisms that grow in bird defecation, that's consistant with: Histo, Plasmosis, Pis Ttacasis, Allergic Alveolitus, Avian influenza, Campylobactericosis...etc.

Second: On or about January 8, 2015 I was seen by a nurse, after complaining about coughing for at least four months uncontrolably, along with wheezing and a stuffy nose. I persumed at first that it was just a cold, so I tried to do the down home remedies; cold tablets, tea and cough drops, which had no effect. So I put in to see the nurse, and after explaining my symptoms, the nurse asked me if I had any allergies, I told her not that I know of, she went on to say that Statville C.C. had a very bad mold problem, that causes the same type of symptoms that I complained of, then it dawn on me about the mold in the showers area, as well as in the library on some of the books and walls, due to the leaking roof.

These areas of the prison I frequent very often; the showers three times a week, and the library almost weekly due to my continuous litigations that I have pending, and these unhealthy conditions will only be exacerbated unless these areas are constantly checked for mold, and the mold removed properly. Mold causes all type of illnesses, and several of which I'H suffering from, because when you are sensitive you'll react with coughing, wheezing, stuffy nose, and/or irritated eyes. According to John Martyny, Ph.D. with the National Jewish Health Center in Denver, "most people have an allergic reaction; lots of continued→

ILLINOIS DEPARTMENT OF CORRECTIONS
## OFFENDER'S GRIEVANCE

| Date: 3·16-15 | Offender: (Please Print) Ramon Montague | ID#: N62212 |
|---|---|---|
| Present Facility: Statville C.C. | Facility where grievance issue occurred: | Statville C.C. |

**NATURE OF GRIEVANCE:**

- ☐ Personal Property
- ☐ Staff Conduct
- ☐ Transfer Denial by Facility
- ☐ Mail Handling
- ☐ Dietary
- ☐ Transfer Denial by Transfer Coordinator
- ☐ Restoration of Good Time
- ☐ Medical Treatment
- ☐ Disability
- ☐ HIPAA
- ☑ Other (specify): _____

☐ Disciplinary Report: ____/____/____  
    Date of Report      Facility where issued

**Note:** Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

**Complete:** Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:

**Counselor,** unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
**Grievance Officer,** only if the issue involves discipline at the present facility or issue not resolved by Counselor.
**Chief Administrative Officer,** only if EMERGENCY grievance.
**Administrative Review Board,** only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

**Brief Summary of Grievance:** I filed an emergency grievance on February 28, 2015 to warden Tarry Williams, pursuant to 20 Ill. Admin. Code § 504.840. (Thornton v. Snyder, 428 F.3d 690). Pertaining to the; unsanity, unhealthy and unsafe condition of my confinement, that has contributed to an environment that's susceptable to all type of illnesses, encluding; but not limited to cancer. (See attached grievance).

    Warden Williams, response was; My grievance was not an emergency. I disagree. I address this very same issue in 2013... (See Counselor's response). I disagreed with the counselor's → ans.

**Relief Requested:** See the 6th page of the initial grievance dated 2-28-15

☐ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

| Ramon Montague | N62212 | 3 / 16 / 15 |
|---|---|---|
| Offender's Signature | ID# | Date |

(Continue on reverse side if necessary)

---

### Counselor's Response (if applicable)

Date Received: ____/____/____    ☐ Send directly to Grievance Officer    ☐ Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: _____

**RECEIVED**
**MAR 20 2015**
**ADMINISTRATIVE REVIEW BOARD**

| Print Counselor's Name | Counselor's Signature | Date of Response __/__/__ |
|---|---|---|

---

### EMERGENCY REVIEW

Date Received: ____/____/____    Is this determined to be of an emergency nature?

☐ Yes; expedite emergency grievance
☐ No; an emergency is not substantiated. Offender should submit this grievance in the normal manner.

Chief Administrative Officer's Signature      Date __/__/__

ILLINOIS DEPARTMENT OF CORRECTIONS

**OFFENDER'S GRIEVANCE (Continued)**

response then, and I followed up to the grievance officer and the warden, as well as to your (A.R.B.) office. Your response was: "I did not file within 60 days of discovery of the incident." I disagreed with your response but chose not to readdress it then, and since then, there have been and still are other civil litigation pertaining to very same subject, that has not been addressed since my initial filing in 2013, to this very day.

Since then I have developed a constant cough, and after seeing the nurse and telling her what my symptoms were, and how I had tried to deal with that myself, the nurse asked if I had any allergies, I said none that I knew of, she went on to say that Stateville C.C. had a very bad mold problem, that causes the same type of symptoms that I was suffering from. Then it dawn on me about the mold in the showers, as well as in the law library... Not to mention the leaking roof, that caused the librarians to throw away some the legal books due to the mold being on them.

I was suppose to follow up the meeting I had with the nurse, three days later being seeing the Doctor... That never happen.

Now I address these issues to your office, in the hopes that these issues are resolved to all included parties liken.

Further Grievant Sayeth Not.

ILLINOIS DEPARTMENT OF CORRECTIONS
## OFFENDER'S GRIEVANCE

3 of 4

| Date: 1-2-13 | Offender: Ramon Montague (Please Print) | ID#: N62212 |
|---|---|---|

| Present Facility: | Facility where grievance issue occurred: |
|---|---|

**NATURE OF GRIEVANCE:**

- [ ] Personal Property
- [ ] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Mail Handling
- [ ] Dietary
- [ ] Transfer Denial by Transfer Coordinator
- [ ] Restoration of Good Time
- [ ] Medical Treatment
- [ ] Disability
- [ ] HIPAA
- [x] Other (specify): _____

- [ ] Disciplinary Report: ____ / ____ / ____
  Date of Report                     Facility where issued

Note: Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

**Complete:** Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
   **Counselor,** unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
   **Grievance Officer,** only if the issue involves discipline at the present facility or issue not resolved by Counselor.
   **Chief Administrative Officer,** only if EMERGENCY grievance.
   **Administrative Review Board,** only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

Brief Summary of Grievance: Continued: The contaminated water supply here, is for the inmates drinking and cooking purposes by the dietary here. This contaminated water consist of excessive amounts of Microbial contaminates, such as: virus and bacteria, inorganic contaminates, such as: salts and metals, Pesticides and Herbicides, including, synthetic and volatile organic chemicals, which are by products of industrial processes and petroleum production, and Radiactive contaminates.
   One specific contaminate in the water here is Radiaction, or shall I say Radium, which, when water containing combined Radium covers

Relief Requested: _____

- [ ] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

_____          _____          ___/___/___
Offender's Signature                    ID#                Date
(Continue on reverse side if necessary)

---

### Counselor's Response (if applicable)

| Date Received: ____ / ____ / ____ | [ ] Send directly to Grievance Officer | [ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277 |
|---|---|---|

Response: _____

RECEIVED
MAR 20 2015
ADMINISTRATIVE REVIEW BOARD

| Print Counselor's Name | Counselor's Signature | Date of Response |
|---|---|---|

---

### EMERGENCY REVIEW

| Date Received: ____ / ____ / ____ | Is this determined to be of an emergency nature? | [ ] Yes; expedite emergency grievance [ ] No; an emergency is not substantiated. Offender should submit this grievance in the normal manner. |
|---|---|---|

_____                           ___/___/___
Chief Administrative Officer's Signature                Date

ILLINOIS DEPARTMENT OF CORRECTIONS
OFFENDER'S GRIEVANCE (Continued)

4 of 4

is ingested, a portion of the Radium may Remain in the bone. And the Radiation which is given off from the Radium, because of its high energy can cause damage to the surrounding tissue. And a dose of 5 µCi/l ingested over an extended period of time may Result in the development of Bone cancer.

Inmates living units are hazardous and unsafe for human occupation. It has been known for years that various buildings here at Stateville C.C. has been hazardous, including, but not limited to the inmates living units, which are unsafe for human occupation. The housing units (X, F, D, E, B, and C) continuously poses a substantial Risk of imminent personal injury and/or death, to all the inmates that are held prisoner here.

Delta, Charlie, Edward, and Bravo houses, is a single building, that has been divided into four quarters, and is unsafe for human occupation, where the building poses a substantial Risk of a complete collapse and/or a partial collapse of the overall building's structure. The structure failure consist of: deteriorating bricks in the 64 columns that support the foundation of the building, with noticeable cracks (multiple) from the foundation/Slab and/or, within floors extending all the way up to the Roof, which is over 5 stories high, which threatens to crumb, or break-away from its extended structure, placing grievant, as well as, all other inmates, and staff life in peril of imminent personal injury and/or even death on a daily basis.

Not only are all 64 support columns cracked from the bottom to the top, but the wall of bricks between various support columns are also crumbling and breaking-away, where it can, in plain view, be seen with approximately one (1) inch gaps and/or spaces with no filler and/or cement.

FURTHER GRIEVANT SAYETH NOT...

ILLINOIS DEPARTMENT OF CORRECTIONS
## OFFENDER'S GRIEVANCE

1 of 4

| Date: 1-3-13 | Offender: (Please Print) Ramon Montague | ID#: N62212 |
|---|---|---|

| Present Facility: Stateville | Facility where grievance issue occurred: Stateville |
|---|---|

GRIEVANCE OFFICE APR 11 2013

**NATURE OF GRIEVANCE:**

- [ ] Personal Property
- [ ] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Mail Handling
- [ ] Dietary
- [ ] Transfer Denial by Transfer Coordinator
- [ ] Restoration of Good Time
- [ ] Medical Treatment
- [ ] Disability
- [ ] HIPAA
- [x] Other (specify): _____

- [ ] Disciplinary Report: ____ / ____ / ____
      Date of Report                     Facility where issued

Note:    Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

**Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:**

Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

Brief Summary of Grievance: I'm writing this grievance due to the: Unsanitary, Unhealthy and Unsafe condition of my imprisonment, that has contributed to my contracting cancer.
            While eating in the chowhall, here at Stateville C.C., I observed the unsanitary and unhealthy condition of the chowhall. First: going through the chowhall, and choosing a tray to eat off of, and finding Not one of them to be clean, every last one of them, where Not only wet, but they had food particles in the corners of each tray. Going into the dinning room to set down and eat, Birds where flying around chowhall, and they have been in the cellhouse since covers)

Relief Requested: that all aforementioned issues are addressed if possible, by informing Grievant what steps have/or are being taking to alleviate these pressing issues.

- [ ] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

| Ramon Montague | N62212 | 1 / 2 / 13 |
|---|---|---|
| Offender's Signature | ID# | Date |

**(Continue on reverse side if necessary)**

---

| **Counselor's Response** (if applicable) | | |
|---|---|---|

Date Received: 1 / 4 / 13    [ ] Send directly to Grievance Officer    [ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: Please See Attachment.

RECEIVED
MAR 20 2015
ADMINISTRATIVE
REVIEW BOARD

| T/k Z Jefferson | | 1 / 16 / 13 |
|---|---|---|
| Print Counselor's Name | Counselor's Signature | Date of Response |

---

| **EMERGENCY REVIEW** | | |
|---|---|---|

Date Received: ____ / ____ / ____    Is this determined to be of an emergency nature?
- [ ] Yes; expedite emergency grievance
- [ ] No; an emergency is not substantiated. Offender should submit this grievance in the normal manner.

_____    ____ / ____ / ____
Chief Administrative Officer's Signature            Date

ILLINOIS DEPARTMENT OF CORRECTIONS
**OFFENDER'S GRIEVANCE** (Continued)

2 of 4

I have been here at Stateville.

I was informed by several inmates that work in the inmate kitchen, that the tray cleaning machine does not work, that they try to clean the trays by hand, but they get backed up, and cannot get all of them clean, so they just put them on the line. This environment is unhealthy and unsanitary to eat in. Especially with Birds freely flying around the chowhall, due to their carrying of various communicable diseases, through the bird it self, its feces, such as: Bird flu, fungi, lice, mites, parasites, spores and various toxins... All of which do/can cause varying human bodily injury. This presence's a health risk that arise from disease organisms that grow in the accumulations of bird droppings, which carry several fungal diseases, that consist of: Histoplasmosis, Psittacosis, Allergic Alveolitus, Avian Influenza, campylobacteriosis... etc.

There's a Rodent problem here at Stateville C.C... I have been in F-house, D-house, C-house, E-house, X-house and the H.C.U., and out of all 6 houses, the H.C.U. is the only unit that I did not see Rodents. The Rodents are so bad that they get into my personal property box, and not eat my store bought food, they eat pages of my books, that's in my property box as well.

I came to Stateville C.C. on Jan a, 1990, and went to Menard C.C. September 1, 1999, then came back March 8, 2006. All of the time that I have imprisoned here, Never has this prison to my knowledge attempted to remove the lead base paint that's on all of the walls, here at Stateville, and they continue to use even more lead paint, to paint other areas that need to be painted. Lead exposure can occur by way of injestion of lead dust through Normal hand-to-mouth contact, during which people swallow lead dust dislodged from deteriorated paint or lead dust. Lead causes Nervous system damage, as well as it can cause Kidney damage and affects every organ system of the body.

Resently, I have been having Kidney problem, were I'm constantly urinating uncontrolably, as well as, other organ affects since I have been here at Stateville.

Stateville has had a problem with contaminated water since I have been here, there has been complaints all the while, and there has been several civil litigations filed on this very urgent and pressing health matter. The problem is bad here, that there is signs entering the prison that warn against drinking the water here. There was suppose to be a change in were our water supply came from, but as of 2010, I found out that I have cancer, and had to have surgery.

Printed on Recycled Paper

ILLINOIS DEPARTMENT OF CORRECTIONS
**OFFENDER'S GRIEVANCE** (Continued)

6 of 6

being compelled to eat mold and the unsanitary conditions of the chowhall.

The unhealthy and unsanitary condition at Stateville C.C. violates grievant's constitutional right, and grievant have a constitutional right not to be exposed to lead paint, mold, and radon in the water (Watson v. Sheahan, 93 C 1871 1994 WL 95782 (N.D. Ill. March 18, 2004).

## RELIEF REQUESTED

1. Fix the dishwashing machine, keep the windows the dinning hall closed so the birds don't come in, and if it's in the summer time, put the big fans in each dinning hall.

2. Have the mold removed professionally, so it's done right; and keep the areas that's always damp and wet, dried up so the mold have no place to form.

3. Have the cells, beds and bars cleaned of the lead based paint; and re-painted with a paint that's not lead based.

4. ensure that the water here at stateville C.C. is safe to consume, so the radon in the water, don't contribute to the colon cancer grievant is recurring from reoccurring.

5. Grievant have a right to be free from retaliation for engaging in constitutional protected conduct, such as complaining about conditions of his imprisonment. Walker v. Thompson, 288 F.3d 1005 (7th Cir. 2002).

ILLINOIS DEPARTMENT OF CORRECTIONS
## OFFENDER'S GRIEVANCE

5 of 6

| Date: 2-28-15 | Offender: (Please Print) Ramon Montague | ID#: N62212 |
|---|---|---|
| Present Facility: Stateville C.C. | Facility where grievance issue occurred: | Stateville C.C. |

NATURE OF GRIEVANCE:

- [ ] Personal Property
- [ ] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Mail Handling
- [ ] Dietary
- [ ] Transfer Denial by Transfer Coordinator
- [ ] Restoration of Good Time
- [ ] Medical Treatment
- [ ] ADA Disability Accommodation
- [ ] HIPAA
- [✓] Other (specify) _____

- [ ] Disciplinary Report: ____/____/____  
Date of Report _____ Facility where issued

Note: Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

Summary of Grievance (Provide information including a description of what happened, when and where it happened, and the name or identifying information for each person involved):

Environment Protection Agency Act 415 ILCS 5/1-57, 17 (1999) (THE ACT), 35 Illinois Administrative Code (35 IAC).
There have been several civil litigation filed on this very urgent and pressing health matters, and the problem has not been addressed. There was suppose to be a change in where we got our water supply, but the radium level is still to high. I found out I had colon cancer in 2011, and I had surgery to remove it that same year... But, the problem will reoccur because of the water, soy based diet that I'm-7

Relief Requested: See page 6

[✓] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

Ramon Montague _____ N62212    2-28-15
Offender's Signature         ID#        Date

(Continue on reverse side if necessary)

| Counselor's Response (if applicable) | | |
|---|---|---|
| Date Received: ____/____/____ | [ ] Send directly to Grievance Officer | [ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277 |

Response: _____

RECEIVED
MAR 20 2015
ADMINISTRATIVE
REVIEW BOARD

Print Counselor's Name _____ Date of Response ____/____/____

| EMERGENCY REVIEW | | |
|---|---|---|
| Date Received: ____/____/____ | Is this determined to be of an emergency nature? | [ ] Yes; expedite emergency grievance [ ] No; an emergency is not substantiated Offender should submit this grievance in the normal manner. |

Chief Administrative Officer's Signature _____ Date ____/____/____

333

ILLINOIS DEPARTMENT OF CORRECTIONS
**OFFENDER'S GRIEVANCE**

3 of 6

| Date: 2-28-15 | Offender: (Please Print) RAMON Montague | ID#: N62212 |

| Present Facility: Stateville C.C. | Facility where grievance issue occurred: Stateville C.C. |

**NATURE OF GRIEVANCE:**

☐ Personal Property  ☐ Mail Handling  ☐ Restoration of Good Time  ☐ ADA Disability Accommodation
☐ Staff Conduct  ☐ Dietary  ☐ Medical Treatment  ☐ HIPAA
☐ Transfer Denial by Facility  ☐ Transfer Denial by Transfer Coordinator  ☐ Other (specify) _____

☐ Disciplinary Report: ____/____/____  _____
Date of Report                    Facility where issued

Note: Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

Summary of Grievance (Provide information including a description of what happened, when and where it happened, and the name or identifying information for each person involved):

sinus drainage, lots of upper respiratory problems, and it doesn't last for just a month or two, this goes on 12 months a year. It is not a minimal problem... it can really change your life". The toxic black mold is harmful and fatal if ingested, inhaled, or exposed to for long period of time I have constitutional right not to be exposed to it.

Third: There are many places where condensation pockets have formed formed from water leaking through the walls and patches of paint have blistered and fallen away leaving every →

Relief Requested: See page 6

☑ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

Ramon Montague        N62212        2-28-15
Offender's Signature        ID#        Date

(Continue on reverse side if necessary)

| Counselor's Response (if applicable) |

Date Received: ____/____/____  ☐ Send directly to Grievance Officer  ☐ Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277.

Response: _____

**RECEIVED**

MAR 20 2015

ADMINISTRATIVE
REVIEW BOARD

Print Counselor's Name          Counselor's Signature          Date of Response

| EMERGENCY REVIEW |

Date Received: ____/____/____  Is this determined to be of an emergency nature?  ☐ Yes: expedite emergency grievance  ☐ No: an emergency is not substantiated. Offender should submit this grievance in the normal manner.

Chief Administrative Officer's Signature          Date

Distribution: Master File; Offender          Page 3          DOC 0046 (8/2012)
Printed on Recycled Paper

layer of paint ever applied to the walls exposed, which in turn, exposes me to the many layers of old toxic paint. Especially, but not limited to lead Acetate: a poisonous crystalline compound used in water proofing and various varnishes and mixed with or applied over paint to produce gloss effects. Lead Chromate: A poisonous yellow crystalline compound used as a paint pigment. Barium Sulface; A poisonous fine white powder used as a pigment in paint. - Cadmium: A poisonous soft Metallic element used as a filler in paint. All of which has been scientifically proven to cause cancer and many other serious health risks, such as PAINTER'S COLIC which is chronic intestinal pains and constipation caused by lead poisoning. So called because the disease is often caused by lead poisoning/ or exposure to lead based paint. In some places the paint has peeled away only to expose colonies of toxic black mold, which is also harmful to and fatal if ingested, inhaled, or exposed to prolonged periods of time. These old layers of paint are also extremely flamable and the fumes from them, if they catch fire, are extremely toxic and will cause serious injury and death if inhaled.

Fourth: Stateville C. C. has been cited several times, along with deficiencies reports from the Illinois Environment Protection Agency over the years, about the contamination of the water. I have been drinking the chowhall and cellhouse water all the while I have been a prisoner. There have been a warden bulletin issued almost yearly concerning the Radioactive Contamination / Contaminants that exceed exceptable limits. These contaminants includes, but are not limited to: Beta / Photon emitters: Gross Alpha including radon and uranium; and Combined Radium 225/228.

The radium as proven by the warden bulletin has often exceeded the Maximum allowable concentration for radium as designated by the Illinois Pollution Control Board, which is 5 Pico- corries per liter. Our water has often exceeded 5 pico- corries per liter. I have suffered long term exposure to these excessive radioactive contaminants. I have been drinking this water from 90-6-99, and from 2006 up until this very day. When water containing combined radium is ingested, a portion of the radium may remain in the bone. The radiaction which is given off from the radium, because of its high energy, can cause damage to the surrounding tissues. Stateville C. C. water violates Title IV of the Illinois

continued →7



# Public Employees Occupational Safety and Health Program

Division of Epidemiology, Environmental and Occupational Health

Christine Todd Whitman
Governor

Christine M. Grant, JD, MBA
Commissioner

April, 2000

# Control of Health Hazards Associated with Bird and Bat Droppings

**Special points of interest:**

- Disease Association
- Recognition
- Evaluation
- Hazard Control
- Recommendations
- Further Information

## Health Risks

Large populations of roosting birds may present a disease risk. The most serious health risks arise from disease organisms that grow in the nutrient-rich accumulations of bird droppings, feathers and debris under a roost — particularly if roosts have been active for years. In addition, insects that live on birds or their droppings may become a problem when the infested birds leave roosts or nests. These insects can invade buildings and bite or irritate people.

This bulletin discusses the health risks and control of the risk of several of the fungal diseases associated with bird and bat droppings and methods of controlling these risks.



The PEOSH Program has evaluated several work sites where employees were concerned about health hazards from accumulated pigeon droppings. The common denominator in these PEOSH investigations has been the presence of roosting pigeons in an undisturbed



location. In one New Jersey worksite, accumulated manure was found in a stair well leading to the basement. Local newspapers reported that a city hall building was "taken over" by pigeons that had deposited several inches of manure on the window ledges. At a bridge commission, employees complained to the PEOSH Program that their booths were covered in pigeon droppings. Maintenance engineers at a university campus were concerned about bird droppings near a ventilation system located on the roof of one of the buildings. Furthermore, several building attics were evaluated because of employee concerns with bird manure accumulations.

EXHIBIT 1.(A)

Several alternatives to using a high-powered water hose exist. One such alternative includes soaking the droppings with water and then shoveling it. The wet material should be collected in heavy-duty plastic bags or another type of secure container and discarded with the regular trash.

Once the structures are cleaned they should be regularly washed to prevent further accumulation of droppings.

## Can My Bird Make Me Sick?

### Common Zoonotic Diseases in Pet Birds

By Alyson Kalhagen, About.com Guide

**See More About:**

- bird health
- bird diseases
- zoonotic diseases

Diseases that can be passed from animals to humans and vice versa are called zoonotic diseases. Those interested in becoming bird owners often wonder if there are any diseases they could catch from their potential feathered friends. The answer is that there are, although it's relevant to point out that owning any type of pet can put you at risk of contracting a zoonotic illness.

Read on to learn about zoonotic illnesses that affect birds and their owners. While the odds of infection are lowered with proper hygiene standards, its important to be familiar with common symptoms and methods of transmission.

**Allergic Alveolitus**
While not truly zoonotic disease in the sense that it does not affect birds, bird owners can contract Allergic Alveolitus by inhaling particles of bird dander in the air. Allergic Alveolitus is also known as Pigeon Lung Disease and Parakeet Dander Pneumoconiosis.

Ads

**Avian Influenza**
The H5N1 Avian Influenza virus is a well-known and deadly zoonotic disease. It is transmitted through coming into contact with the fecal matter of infected birds. While H5N1 isn't seen as a particularly common threat to

48

2

*EXHIBIT 4 (8)*

Psittacosis (also known as ornithosis or parrot fever) is a rare infectious disease that mainly affects parrots and parrot-like birds such as cockatiels, and parakeets, but may also affect other birds, such as pigeons. When bird droppings dry and become airborne people may inhale them and get sick.

In humans, this bacterial disease is characterized by: fatigue, fever, headache, rash, chills, and sometimes pneumonia. Symptoms develop about 10 days after exposure. Psittacosis can be treated with a common antibiotic.

Since 1996, fewer than 50 confirmed cases were reported in the United States annually. In New York City, psittacosis is very rare with less than one human case identified each year. According to the CDC, about 70% of infected people had contact with infected pet birds. Those at greatest risk include bird owners, pet shop employees, veterinarians, and people with compromised immune systems. No person-to-person cases have ever been reported.

**Cleaning Up Pigeon Droppings**

Protecting the health of both workers who clean up pigeon droppings and the general public is important.

*General Public*
Routine cleaning of droppings (e.g. from windowsills) does not pose a serious health risk to most people. Some simple precautions can be taken to further reduce direct contact with droppings, such as wearing disposable gloves and clothes that can be washed.

*Workers*
Before any extensive clean-up measures are taken - e.g., removing accumulations inside an air shaft - workers should be informed of the possible health risks involved, particularly those with weakened immune systems. Even though histoplasmosis, cryptococcosis, and psittacosis pose minor public health threats, they can be further minimized if safety measures are taken. Wearing protective clothing like disposable coveralls, boots, gloves, and respirators can be used for protection.

If a high-powered water hose is used to strip off dried droppings, dust control measures such as containing the area with plastic sheeting, should be taken. Wetting down the work area will prevent inhalation, reduce the risk of infection and will also prevent the spread of dust outside the work area. Those with a compromised immune system such as people living with HIV/AIDS or cancer patients should not be directly involved in the removal of the droppings. Always wash hands and any exposed skin before eating or drinking and when finished with work.

3



**Illinois**
**Department of**
**Corrections**

EXHIBIT 5

**Pat Quinn**
Governor

**S. A. Godinez**
Director

Stateville Correctional Center / Rt. 53 / P.O. Box 112 / Joliet, IL 60434 / Telephone: (815) 727 -3607 / TDD: (800) 526-0844

# M E M O R A N D U M

**DATE:**     July 21, 2014

**TO:**

**FROM:**     V.P. Calloway
Assistant Warden of Programs

**SUBJECT:** <u>**LIBRARY**</u>

This is in response to your letter regarding the Library not being open.  Please be advised that the general library has been open to offenders.  Most of the books in the library have some form of mold on them due to the leaking roof however there are two carts of books available for general reading purposes that do not have mold of them.

I trust this addresses your concerns.


VPC: dv

cc: Master File M10108
    Chron
    File

EXHIBIT 6



Illinois Department of Labor
Safety Inspection and Education Division

CITATION

APR 0 9 2007

Citation Date:
Inspection Date: 02/23/2007
Report Number: C-H-2007-0819-CI
Inspector ID: EDL

For Violation of the Illinois Health and Safety Act

To: Department of Corrections

> Gary Pierce, Deputy Director
> Stateville Correctional Facility
> Route 53
> Joliet, IL 60432

Inspection Site:

> Academic Building

This citation describes violations of occupational safety and health requirements of the Illinois Health and Safety Act. You must abate violations during the time period specified below unless the citation is appealed through the procedures described by the transmittal letter. It is against the law for an employer to discharge or otherwise discriminate against employees who exercise their rights provided by the Health and Safety Act.

The LAW REQUIRES that a copy of this citation be posted immediately in a prominent place at or near the location of the violation(s) cited below. The Citation must remain posted until the violations cited below have been abated or for three working days (excluding weekends and state holidays), whichever is longer.

| Item Number | Hazard Type | Standard, Regulaton, or Act Violated/Description of Violation | Days to Abate |
|---|---|---|---|
| | | | 15 |
| 1 | S | 29 CFR 1910.22 (a) (1) <br><br> "ALL PLACES OF EMPLOYMENT, PASSAGEWAYS, STOREROOMS, AND SERVICE ROOMS SHALL BE KEPT CLEAN AND ORDERLY AND IN SANITARY CONDITION." <br><br> Employer failed to maintain its workplace in good repair. Leaking roof in the Academic Building had been a problem for several years. Employer was aware of the condition of the building. The condition has contributed to fungal growth possibly affecting the health of some building occupants. The complaint investigation conducted on February 22, 2007 revealed evidence of water intrusion and presence of moisture in the building. Ceiling panels had either fallen or been removed due water damage. Water stains were visible on ceiling panels and carpets. Buckets were positioned at work aisles to catch the leaks. An employee reported an allergic reactions and have experienced respiratory-type symptoms as a result of possible exposure to mold. Air and swipe samples were obtained during this investigation. Samples were submitted to Aerotech Laboratories for direct microscopic including fungal spore and mycelial fragment analysis. Total fungal spores including Cladosporium species were identified at elevated levels in the swipe sample obtained at employee work station. Yeast was also identified. Employer representative was notified of the laboratory results. He was advised to move and relocate the employee. Employer representative was also advised to clean and disinfect all contaminated areas. | |

*Hazard Type: I) Imminent Danger S) Serious W) Willful O) Other*

NOTICE TO EMPLOYEES: Employees may appeal the abatement time specified by this citation if they believe the time is unreasonable by notifying the Illinois Department of Labor in writing 15 days of the receipt of the citation by the

Case: 1:16-cv-02609 Document #: 1 Filed: 02/25/16 Page 46 of 87 PageID #:46

EXHIBIT 7 (1-4)

# blackmold.awardspace.com

## Mold
**What is Mold**
**Mold Symptoms**
**Mold & Hair Loss**

## Mold Removal
**Mold Removal**
**Mold Remediation Guide**
**Drywall, Wood, Carpet, Tiles**
**Mold on Clothes**
**Vacuum Mold**

## Mold Detection
**Signs of Mold**
**Mold Inspection**
**Mold Testing**

## Mold in House
**Causes of Mold**
**How to Prevent Mold**
**Where Mold Grows**
**Mold & Flooding**
**Air Purifier for Mold**

## Mold in Rooms
**Mold in Bathroom**
**Mold in Kitchen**
**Mold in Basement**

## Toxic Mold
**Black Mold (Stachybotrys)**
**Black Mold Symptoms**
**Black Mold Spores**
**Black Mold Removal**
**Black Mold History**
**Aspergillus**

## Mycotoxins & MVOCs
**Mycotoxins**
**Aflatoxin Mycotoxins**
**Trichothecene Mycotoxins**
**MVOCs**

## Toxic Black Mold Symptoms

# Quotes on Mold Removal

### Find Mold Removal Contractors Now. Fast & Free. Enter Your Zip Code!

On this page you will find symptoms caused by the **Stachybotrys chartarum** species of mold, which is also called black mold or toxic black mold.

However not all mold that looks black is Stachybotrys and in fact most dark mold isn't even toxic. For a list of symptoms that other molds can cause visit the **Mold Symptoms** page.

### Types of Toxic Black Mold Symptoms

Toxic black mold causes serious symptoms and health problems such as mental impairment, breathing problems, damage to internal organs and sometimes even death. The main groups of symptoms toxic black mold causes are:

- Mental and neurological symptoms
- Respiratory symptoms
- Circulatory symptoms
- Vision and eye problems
- Skin problems
- Immune system problems
- Reproductive system problems
- Tiredness and discomfort
- Other illnesses and health effects

### Mental and Neurological Symptoms From Toxic Black Mold

The trichothecene mycotoxins produced by toxic black mold are neurotoxic. This means they can kill neurons in the brain and impair a person's mental ability. They also cause nervous disorders such as tremors and can cause personality changes such as mood swings and irritability.

Symptoms:

- Confusion
- Brain fog
- Shortened attention span
- Difficulty concentrating and paying attention
- Slowed reflexes
- Disorientation
- Dizziness
- Memory loss and memory problems
- Impaired learning ability
- Hallucinations
- Shock
- Anxiety
- Depression
- Aggression and other personality changes
- Tingling
- Trembling
- Shaking
- Seizure
- Numbness

### Skin Symptoms From Toxic Black Mold

Through the skin is one of the three main ways that toxic black mold mycotoxins enter the human body. There have been cases in the past where people have handled hay contaminated with toxic black mold and developed severe rashes and skin problems on their body where they touched the hay, as well as on sweaty areas like the armpits.

Symptoms:

- Crawling skin
- Dermatitis - skin inflammation, rash, blisters, itchiness
- Jaundice (yellowing of the skin)

### Immune System Symptoms From Toxic Black Mold

Toxic black mold puts out chemicals which suppress the immune system. In fact many immunosuppressive drugs are actually created from toxic molds. A person who is immunocompromised from being around toxic black mold will more easily get infections and sicknesses.

Symptoms:

- Immunosuppression - immune system not functioning properly
- Infections reoccurring

### Reproductive System Symptoms From Toxic Black Mold

Mycotoxins from toxic black mold are teratogenic. This means they can cause problems in the fetus during pregnancy which then leads to birth defects. Toxic black mold mycotoxins are also cytoxotic and mutagenic (cause cell mutations) and inhibit protein synthesis including DNA and RNA.

Symptoms:

- Infertility
- Miscarriage
- Impotence
- Fetal development problems

### Tiredness and Discomfort Symptoms From Toxic Black Mold

When a person is around toxic black mold the immune system may release a sedative called Chloral Hydrate. This is used as a defense to try to slow down the effects of toxic black mold. But this also makes a person tired and causes fatigue. Toxic black mold can also cause soreness of the muscles and joints.

Symptoms:

- Chronic fatigue
- Drowsiness
- Weakness
- Aches and pains
- Muscle pain
- Chest pain
- Abdominal pain
- Joint pain
- Malaise - general discomfort
- Headaches
- Cold or flu type symptoms or recurring colds
- Fever
- Nausea
- Vomiting
- Diarrhea

### Other Symptoms From Toxic Black Mold

Symptoms:

- Hair loss
- Weight loss, anorexia

### Respiratory Symptoms From Toxic Black Mold

# Memory Care Facility

## Join Over 1 Million Families Served Speak with a Local Care Advisor!

People living in homes with toxic black mold are exposed mainly through breathing in toxic black mold spores and mycotoxins. Toxic black mold mycotoxins create irritation and a burning feeling in a person's air passages such as the nasal cavity, mouth and throat.

The mycotoxins can even become lodged in the mucus membranes, sinuses and the lungs which then causes a burning feeling, breathing problems and bleeding in the lungs.

Symptoms:

- Difficulty breathing - breathlessness or shortness of breath
- Wheezing
- Coughing
- Pulmonary edema - swelling of the lungs
- Pulmonary hemorrhage - bleeding in the lungs
- Sore throat
- Burning sensation of the mouth
- Bleeding gums
- Runny nose
- Itchy nose
- Stuffy, blocked nose
- Nose bleeds

### Circulatory Symptoms From Toxic Black Mold

Toxic black mold mycotoxins can be breathed in, ingested, or absorbed through a person's skin or eyes. Eventually the mycotoxins then find their way into the person's blood. This leads to heart damage, problems with blood clotting and internal or external hemorrhaging.

Symptoms:

- Irregular heartbeat
- Heart inflammation
- Damage to heart
- Low blood pressure
- Bone marrow disruption
- Bleeding tendency
- Blood not clotting properly
- Hemorrhage - internal bleeding
- Vomiting up blood
- Bleeding in the brain and in other organs

### Vision and Eye Symptoms From Toxic Black Mold

Toxic black mold mycotoxins that are in the air can enter a person's eyes. The mycotoxins are cytotoxic (toxic to cells) and when they come into contact with eye cells they cause inflamed and injured eyes and create vision problems.

Symptoms:

- Eye inflammation and soreness
- Red or bloodshot eyes
- Eye damage
- Blurry vision and vision worsening
- Jaundice (yellowing of the eyes)

- Hearing loss
- Liver disease
- Coma
- Death

## Toxic Black Mold Causes Allergic Symptoms

Like other molds, toxic black mold is allergenic. The **spores** from toxic black mold cause allergic reactions such as breathing problems, sore eyes, runny nose, itchiness, sneezing and a sore throat.

For a more detailed list of allergic reactions caused by mold visit **Mold Symptoms and Allergic Reactions**.

## Differing Toxic Black Mold Symptoms

Toxic black mold affects different people in different ways. Some people won't experience symptoms as severe as what others experience. Children, the elderly and people with weak immune systems are usually the worst affected by toxic black mold.

## Toxic Black Mold and Cancer

Experts suspect that toxic black mold can cause cancer, although there still needs to be more research. Some other toxic molds, like **Aspergillus** for example, definitely cause cancer though. The **aflatoxin mycotoxins** which Aspergillus produce are among the most powerful carcinogens.

## Are Toxic Black Mold Symptoms Permanent?

Once a person is no longer around toxic black mold most of their symptoms should gradually decrease. Some of the health problems caused by toxic black mold are permanent though. For example, after a person has lived with toxic black mold their immune system won't be as strong as it used to be and they'll be more sensitive to mold and mycotoxins in the future.

# Mold Can Make You Sick

Test Your Home For Toxic Molds; Four Low Cost Tests To Choose From!

EXHIBIT 8

September 4, 2001

WARDEN'S BULLETIN# 2001 - 81

TO:     ALL STAFF AND INMATES

RE:     RADIUM IN WATER EXCEEDS LIMITS

This notice is for informational purposes only, and is NOT a notice of immediate hazard to water consumers. Should a hazard exist, immediate notification will be made.

The Stateville Correctional Center wishes to advise its staff and residents that the maximum allowable concentration for Radium has been exceeded in samples collected during the past year. The maximum allowable concentration for Radium as designated by the Illinois Pollution Control Board is 5 Pico Cories per liter. Our Water test is at 12.5 PC/L.

Some forms of radiation can occur naturally in water. If the water is drawn from a formation that contains deposits of radioactive minerals, a small amount will dissolve and be present in the water. When water containing combined radium is ingested, a portion of the radium may remain in the bone. The radiation which is given off from the radium, because of its high energy, can cause damage to the surrounding tissue. A dose of 5 pCi/l ingested over a extended period of time may result in the development of bone cancer in a very small portion of the population. At the levels detected, the short term risk is minimal and no special precautions need to be taken by the consumer at this time.

A routine sampling schedule has been established for our Water Supply and we will provide the Analytical results on a regular basis.

Kenneth R. Briley, Warden
Stateville Correctional Center

KRB:VV:pjm

Cc:  Employees
     S.C.C./M.S.U.

*EX. 9*

*Ex #2*

# Radionulides in Drinking Water Consumer Fact Sheet

### January 2005

A radionuclide is any naturally occurring or man-made radioactive element. USEPA (EPA) has revised the current radionuclides regulation, which has been in effect since 1977, by requiring new monitoring provisions that will ensure that all customers of community water systems receive water that meets the Maximum Contaminant Levels (MCLs) for radionuclides in drinking water. The revised regulation includes a new 30 ug/L standard for uranium. Nationally, this rule will provide improved health protection for 420,000 persons through monitoring improvements for the combined radium standard (a carcinogen) and for an additional 620,000 persons through a new standard for uranium (a kidney toxin and carcinogen) in drinking water. This rule applies to community water systems, which are water systems with at least 15 service connections or that serve 25 or more persons year-round.

| Regulated Radioactive Drinking Water Contaminants | | |
|---|---|---|
| Contaminant | MCL | Source |
| Combined radium-226 and radium-228 | 5 pCi/L | Naturally occurs in some drinking water sources |
| (Adjusted) Gross Alpha | 15 pCi/L (not including radon or uranium) | Naturally occurs in some drinking water sources |
| Beta Particle and Photon Radioactivity | 4 mrem/year | May occur due to contamination from facilities using or producing radioactive materials. |
| Uranium | 30 µg/L (2000) | Naturally occurs in some drinking water sources. |

## What is radiation and where does it come from?

Think back to high school chemistry class and the atom. The atom is the simplest unit that an element can be divided into while retaining its original properties. Atoms are made up of protons, neutrons, and electrons. Protons and neutrons are found in the nucleus of an atom while electrons orbit the nucleus. The number of protons in the nucleus determines what the element is. The number of neutrons may vary and results in different forms, or isotopes, of an element. Only certain ratios of protons and neutrons are stable. If an unstable ratio exists, the nucleus attempts to become stable by ejecting particles. This process is called radioactive disintegration or decay.

Different types of radioactive emissions exist: alpha particle, beta particle, and gamma rays. They are described by their ability to penetrate matter. Alpha particles have the least penetration power, beta particles have more penetration power, and gamma rays are the most powerful.

We are exposed to radiation daily and it is impossible to avoid. The majority of the radiation we are exposed to occurs naturally. The greatest exposure is from cosmic radiation that comes from outer space, including the sun. Exposure to cosmic radiation depends on the elevation where we live. People living in Denver receive three times more cosmic radiation annually than people living in Chicago. Other sources include x-rays and radon gas.

## What is the risk?    EX.9.a    EX#9

USEPA has estimated that the *additional lifetime* risk of cancer associated with drinking water with gross alpha radiation levels of 15 pCi/L (MCL) or combined radium of 5pCi/L (MCL) is about 1 in 10,000. The analysis assumes consumption of 2 liters of water per day for 70 years. The risk doubles to 2 in 10,000 at 10 pCi/L of combined radium, and becomes 3 in 10,000 at 15pCi/L of combined radium.

Comparably and including all risks, the American Cancer Society indicates that approximately 4,400 in 10,000 Americans will develop cancer at some point in their lifetimes, and approximately 2,200 in 10,000 will die from cancer.

## Are there other provisions specified in the new radionuclide rule?

In addition to meeting the MCLs, the new rule requires that all future monitoring be performed such that all water entering the distribution system is tested. Under the old rule, community water systems only tested water from a "representative point" in the distribution system. The old monitoring requirements did not protect every customer, since water quality may vary significantly within the distribution system.

The monitoring frequency requirements have changed to be more consistent with the "Standardized Monitoring Framework" that other drinking water standards use. This improvement will result in increased consistency in monitoring requirements and will provide monitoring relief via decreased testing for those water systems that have very low contaminant levels.

In addition, the new rule corrects a monitoring deficiency for combined radium–226 and–228. Under the old rule, it was assumed that radium–226 and gross alpha levels could be used to screen for radium–228. Since 1977, EPA has collected substantial evidence that this assumption is false. The correction involves separate monitoring requirements for radium–228, further ensuring that drinking water system customers will be protected from harmful radioactive contaminant levels.

## Can radionuclides be removed from drinking water?

Supplies that exceed a radionuclide standard are required to reduce the level below acceptable limits. This can be done in a variety or ways, such as:

- Install mechanical treatment to remove the radionuclide from the water
- Blend high-level radionuclide water with low-level radionuclide water (dilute)
- Connect to another local water supply
- Drill new radionuclide "free" wells.

All the options listed above are complex, require a lot of planning and permits, and are usually expensive. It is the responsibility of the water supply to study each option and determine which is most effective, both mechanically any financially. It is the responsibility of the Illinois EPA to ensure that when a system exceeds a radionuclide standard, the system aggressively explores treatment options and compliance is achieved in the shortest amount of time.

Certain water softeners, ion exchange, or reverse osmosis water treatment systems can also be installed in homes to reduce radium. Homeowners using these methods must be careful to maintain units according the manufacturer's instructions.

*EX. # 9 (6)*          *EX # 2*

## What is adjusted gross alpha?

Gross alpha is the total (gross) activity of all alpha-emitting particles. *Adjusted gross alpha* is the gross alpha with the activity contributed from uranium and radon subtracted. Radium-226 also emits alpha particles, but is not subtracted. Most alpha emitters are natural occurring.

## What is combined radium?

The total (expressed in pCi/L) of radium-226 and radium-228. Radium-226 and radium-228 are two of many naturally occurring radioactive elements. Radium-228 is a beta-emitter.

## Why do radionuclides occur in drinking water?

Certain rock formations contain naturally occurring radionuclides. In Illinois, they are mainly found in deep bedrock aquifers in Northern Illinois. Overtime, these radioactive elements dissolve into water from which communities pull water.

Most drinking water sources have very low levels of radioactive contaminants ("radionuclides"). These very low levels are not considered to be a public health concern. Of the small percentage of drinking water systems with radioactive contaminant levels high enough to be of concern, most of the radioactivity is naturally occurring. Some parts of the mid-West, including Illinois, have significantly higher average combined radium. While there are other radionuclides that have been known to occur in a small number of drinking water supplies, their occurrence is thought to be rare compared to radium–226 and radium–228.

A very small percentage of drinking water systems are located in areas that have potential sources of man-made radioactive contamination from facilities that use, manufacture, or dispose of radioactive substances. Drinking water contamination may occur through accidental releases of radioactivity or through improper disposal practices. Water systems that are vulnerable to this type of contamination are required to perform extensive monitoring for radioactive contamination to ensure that their drinking water is safe. These radionuclides are regulated under the "beta particle and photon radioactivity" standard.

The concentration of radionuclides in your drinking water is listed in your water supply's annual Consumer Confidence Report (CCR). The CCR is an annual drinking water quality report that identifies all the contaminants found in your drinking water as well as the level found. To obtain a copy of your most recent CCR, contact your local water department. In addition, any water supply that exceeds a radionuclide standard is required by law to issue a quarterly public notice to every water customer as long as the condition exist.

## What are the health effects?

Some types of radiation are more energetic. One type, non-ionizing, has enough energy to move atoms, but not enough energy to alter them chemically. Another type of radiation, ionizing, has enough energy to penetrate a human cell and may damage or change that cell over time. Changes in cells may lead to cancer.

Health effects from naturally occurring radionuclides in drinking water are attributed to ingestion. Bathing or other external contact is not a hazard. Long-term exposure to radionuclides in drinking water may cause cancer. People are diverse and respond differently to exposure due to metabolism and genetics. In addition, exposure time and levels can effect the rate of risk. Short-term exposure to naturally occurring radionuclides does not present any known health effects at levels found in Illinois potable water.

EX. 9.3(c)                                    EX#3

## What is the cost involved in removing radionuclides?

For the small percentage of households that are served by water systems that will be required to take corrective actions because of this rule, it is estimated that households served by typical large water systems will experience increased water bills of less than $30 per year and that households served by typical small water systems (those serving 10,000 persons or fewer) will experience increased water bills of $50 – $100 per year.

## For more information concerning radionuclides in drinking water:

| Contact | At |
|---|---|
| USEPA Safe Drinking Water Hotline | 1-800-426-4791 |
| USEPA Safewater website | http://www.epa.gov/safewater |
| IEPA, Drinking Water Compliance Unit | 217-785-0561 |

EX. 10

# WATER TESTING IN

# PROGRESS

## PLEASE DO NOT USE

## WATER FROM THIS

## SITE

# Date: 8/11/2015

Sign will be removed when testing completed



EX. 11



# Annual Drinking Water Quality Report

STATEVILLE CORRECTIONAL CENTER

IL1977910

**Annual Water Quality Report for the period of January 1 to December 31, 2007**

This report is intended to provide you with important information about your drinking water and the efforts made by the STATEVILLE CORRECTIONAL CENTER water system to provide safe drinking water. The source of drinking water used by STATEVILLE CORRECTIONAL CENTER is Purchase Water.

For more information regarding this report contact:

Name  Bill Schriever

Phone  815 727 3607 7555

Este informe contiene información muy importante sobre el agua que usted bebe. Tradúzcalo ó hable con alguien que lo entienda bien.

### Source of Drinking Water

The sources of drinking water (both tap water and bottled water) include rivers, lakes, streams, ponds, reservoirs, springs, and groundwater wells. As water travels over the surface of the land or through the ground, it dissolves naturally-occurring minerals and, in some cases, radioactive material, and can pick up substances resulting from the presence of animals or from human activity.

Contaminants that may be present in source water include:

Microbial contaminants, such as viruses and bacteria, which may come from sewage treatment plants, septic systems, agricultural livestock operations and wildlife.

Inorganic contaminants, such as salts and metals, which can be naturally occurring or result from urban storm water runoff, industrial, or domestic wastewater discharges, oil and gas production, mining, or farming.

Pesticides and herbicides, which may come from a variety of sources such as agriculture, urban storm water runoff, and residential uses.

Organic chemical contaminants, including synthetic and volatile organic chemicals, which are by-products of industrial processes and petroleum production, and can also come from gas stations, urban storm water runoff, and septic systems.

Radioactive contaminants, which can be naturally-occurring or be the result of oil and gas production and mining activities.

Drinking water, including bottled water, may reasonably be expected to contain at least small amounts of some contaminants. The presence of contaminants does not necessarily indicate that water poses a health risk. More information about contaminants and potential health effects can be obtained by calling the EPA's Safe Drinking Water Hotline at (800) 426-4791.

In order to ensure that tap water is safe to drink, EPA prescribes regulations which limit the amount of certain contaminants in water provided by public water systems. FDA regulations establish limits for contaminants in bottled water which must provide the same protection for public health.

Some people may be more vulnerable to contaminants in drinking water than the general population. Immuno-compromised persons such as persons with cancer undergoing chemotherapy, persons who have undergone organ transplants, people with HIV/AIDS or other immune system disorders, some elderly and infants can be particularly at risk from infections. These people should seek advice about drinking water from their health care providers. EPA/CDC guidelines on appropriate means to lessen the risk of infection by Cryptosporidium and other microbial contaminants are available from the Safe Drinking Water Hotline (800-426-4791).

### Source Water Assessment:

A Source Water Assessment summary is included below for your convenience.

Based on information obtained in a Well Site Survey published in 1987 by the Illinois EPA, three potential sources or possible problem sites were identified within the survey area of Crest Hill's wells. Furthermore, information provided by the Leaking Underground Storage Tank Section of the Illinois EPA indicated several additional sites with ongoing remediations which may be of concern. The Illinois EPA has determined that the Crest Hill's wells #4, #8 and #9 source water is not susceptible to contamination; however, the source water obtained from Wells 1, #6, and #7 is susceptibility to contamination. This determination is based on a number of criteria including: monitoring conducted at the wells; monitoring conducted at the entry point to the distribution system; and the available hydrogeologic data on the well. The Illinois Environmental Protection Act provides minimum protection zone of 400 feet for Crest Hill wells #1,#6, and #7 and 200 feet for well #4, #8 and #9. These minimum protection zones are regulated by the Illinois EPA. To further minimize the risk to the groundwater supply, the Illinois EPA recommends that six additional activities be assessed. First, the city should obtain aquifer property data and groundwater flow direction information so the recharge area for the cities Wells #1, #6 and #7 can be mapped. This information can be obtained by completing pump tests on the CWS wells and completing mass water level measurements on wells finished in the aquifer utilized by Wells #1, #6 and #7. Upon completing this effort, the city may wish to enact a "maximum setback zone" ordinance(s) to further protect their water supply. These ordinances are authorized by the Illinois Environmental Protection Act and allow county and municipal officials the opportunity to provide additional protection up to a fixed distance, normally 1,000 feet, from their wells. Third, the city water supply staff may wish to revisit their contingency planning documents. Contingency planning documents are a primary means to ensure that, through emergency preparedness, a city will minimize their risk of being without safe and adequate water. Fourth, the water supply staff is encouraged to review their cross connection control program to ensure that it remains current and viable. Cross connections to either the water treatment plant (for example, at bulk water loading stations) or in the distribution system may negate all source water protection initiatives provided by the city. Fifth, the city should explore the options of either properly abandoning the inactive Wells #10 and #11 or retrofitting them for active use as a source water supply. Inactive wells that are not properly abandoned can act as direct conduits for surficial contaminants into the aquifer and are considered "routes" under the Illinois Environmental Protection Act. Finally, the Illinois EPA recommends that the city investigate additional source water protection management options to address land use activities within the recharge areas of Wells #1, #6 and #7. Specifically, these management options must include potential impacts from point and nonpoint sources of groundwater contamination.

EX. 11.(a)

## 2007 Regulated Contaminants Detected

**Lead and Copper**

Date Sampled: 6/30/2006

Definitions:

Action Level (AL): The concentration of a contaminant which, if exceeded, triggers treatment or other requirements which a water system must follow.

Action Level Goal (ALG): The level of a contaminant in drinking water below which there is no known or expected risk to health. ALG's allow for a margin of safety.

| Lead MCLG | Lead Action Level (AL) | Lead 90th Percentile | # Sites Over Lead AL | Copper MCLG | Copper Action Level (AL) | Copper 90th Percentile | # Sites Over Copper AL | Likely Source Of Contamination | |
|---|---|---|---|---|---|---|---|---|---|
| 0 | 15 ppb | 7.4 ppb | 1 | 1.3 ppm | 1.3 ppm | 1.9 ppm | 4 | Corrosion of household plumbing systems; Erosion of natural deposits | Edit |

Copper is an essential nutrient, but some people who drink water containing copper in excess of the action level over a relatively short amount of time could experience gastrointestinal distress. Some people who drink water containing copper in excess of the action level over many years could suffer liver or kidney damage. People with Wilsons Disease should consult their personal doctor.

**Water Quality Test Results**

Definitions: The following tables contain scientific terms and measures, some of which may require explanation.

Maximum Contaminant Level (MCL): The highest level of a contaminant that is allowed in drinking water. MCL's are set as close to the Maxium Contaminant Level Goal as feasible using the best available treatment technology.

Maximum Contaminant Level Goal (MCLG): The level of a contaminant in drinking water below which there is no known or expected risk to health. MCLG's allow for a margin of safety.

mg/l: milligrams per litre or parts per million - or one ounce in 7,350 gallons of water.

na: not applicable.

Avg: Regulatory compliance with some MCLs are based on running annual average of monthly samples.

ug/l: micrograms per litre or parts per billion - or one ounce in 7,350,000 gallons of water.

Maximum Residual Disinfectant Level (MRDL): The highest level of disinfectant allowed in drinking water.

Maximum Residual Disinfectant Level Goal (MRDLG): The level of disinfectant in drinking water below which there is no known or expected risk to health. MRDLG's allow for a margin of safety.

**Regulated Contaminants**

| Disinfectants & Disinfection By-Products | Collection Date | Highest Level Detected | Range of Levels Detected | MCLG | MCL | Units | Violation | Likely Source Of Contaminant | |
|---|---|---|---|---|---|---|---|---|---|
| Total Haloacetic Acids (HAA5) | 7/6/2005 | 2.8 | Not Applicable | N/A | 60 | ppb | No | By-product of drinking water chlorination | Edit |
| TTHMs [Total Trihalomethanes] | 8/29/2006 | 1.6 | Not Applicable | N/A | 80 | ppb | No | By-product of drinking water chlorination | Edit |

Note: The state requires monitoring of certain contaminants less than once per year because the concentrations of these contaminants do not change frequently. Therefore, some of this data may be more than one year old.

RECEIVED

JUN  5 2008

IEPA/CAS

2007 Regulated Contaminants

EX. 11(b)

Water Quality Test Results

Definitions: The following tables contain scientific terms and measures, some of which may require explanation
Maximum Contaminant Level (MCL): The highest level of a contaminant that is allowed in drinking water. MCL's are set as close to the Maxium Contaminant Level Goal as feasible using the best available treatment technology.
Maximum Contaminant Level Goal (MCLG): The level of a contaminant in drinking water below which there is no known or expected risk to health. MCLG's allow for a margin of safety.
mg/l: milligrams per litre or parts per million - or one ounce in 7,350 gallons of water.
ug/l: micrograms per litre or parts per billion - or one ounce in 7,350,000 gallons of water.
na: not applicable.
Avg: Regulatory compliance with some MCLs are based on running annual average of monthly samples.
Maximum Residual Disinfectant Level (MRDL): The highest level of disinfectant allowed in drinking water.
Maximum Residual Disinfectant Level Goal (MRDLG): The level of disinfectant in drinking water below which there is no known or expected risk to health. MRDLG's allow for a margin of safety.

Regulated Contaminants

| Disinfectants & Disinfection By-Products | Collection Date | Highest Level Detected | Range of Levels Detected | MCLG | MCL | Units | Violation | Likely Source Of Contaminant | |
|---|---|---|---|---|---|---|---|---|---|
| Chlorine | 12/31/2007 | 0.2 | 0.1 - 0.2 | MRDLG=4 | MRDL=4 | ppm | No | Water additive used to control microbes | Edit |
| TTHMs [Total Trihalomethanes] | 8/21/2007 | 1 | Not Applicable | N/A | 80 | ppb | No | By-product of drinking water chlorination | Edit |

| Inorganic Contaminants | Collection Date | Highest Level Detected | Range of Levels Detected | MCLG | MCL | Units | Violation | Likely Source Of Contaminant | |
|---|---|---|---|---|---|---|---|---|---|
| Arsenic | 8/8/2006 | 1.6 | 0.7 - 1.6 | 0 | 10 | ppb | No | Erosion of natural deposits; Runoff from orchards; Runoff from electronics production wastes | Edit |
| Barium | 8/8/2006 | 0.12 | 0.08 - 0.12 | 2 | 2 | ppm | No | Discharge of drilling wastes; Discharge from metal refineries; Erosion of natural deposits | Edit |
| Fluoride | 8/8/2006 | 1.16 | 0.9 - 1.16 | 4 | 4 | ppm | No | Erosion of natural deposits; Water additive which promotes strong teeth; Fertilizer discharge | Edit |
| Nitrate-Nitrite | 4/18/2007 | 0.31 | 0.12 - 0.31 | 10 | 10 | ppm | No | Runoff from fertilizer use; Leaching from septic tanks, sewage; Erosion of natural deposits | Edit |
| Nitrate (As N) | 4/18/2007 | 0.31 | 0.12 - 0.31 | 10 | 10 | ppm | No | Runoff from fertilizer use; Leaching from septic tanks, sewage; Erosion of natural deposits | Edit |

| Radioactive Contaminants | Collection Date | Highest Level Detected | Range of Levels Detected | MCLG | MCL | Units | Violation | Likely Source Of Contaminant | |
|---|---|---|---|---|---|---|---|---|---|
| Combined Radium | 10/10/2006 | 2.5 | 0.8 - 2.5 | 0 | 5 | pCi/L | No | Erosion of natural deposits | Edit |
| Alpha Emitters | 10/10/2006 | 4 | 1 - 4 | 0 | 15 | pCi/L | No | Erosion of natural deposits | Edit |

| State Regulated Contaminants | Collection Date | Highest Level Detected | Range of Levels Detected | MCLG | MCL | Units | Violation | Likely Source Of Contaminant | |
|---|---|---|---|---|---|---|---|---|---|
| Iron This contaminant is not currently regulated by USEPA. However, the state has set an MCL for this contaminant for supplies serving a population of 1000 or more. | 8/8/2006 | 200 | 0 - 200 | N/A | 1000 | ppb | No | Erosion from naturally occurring deposits | Edit |
| Manganese This contaminant is not currently regulated by USEPA. However, the state has set an MCL for this contaminant for supplies serving a population of 1000 or more. | 8/8/2006 | 19 | 0 - 19 | N/A | 150 | ppb | No | Erosion of naturally occurring deposits | Edit |
| Sodium There is not a state or federal MCL for sodium. Monitoring is required to provide information to consumers and health officials that are concerned about sodium intake due to dietary precautions. If you are on a sodium-restricted diet, you should consult a physician about this level of sodium in the water. | 8/8/2006 | 95 | 16 - 95 | N/A | N/A | ppm | No | Erosion of naturally occuring deposits; used in water softener regeneration | Edit |

Note: The state requires monitoring of certain contaminants less than once per year because the concentrations of these contaminants do not change frequently. Therefore, some of this data may be more than one year old.

Consumer Confidence Report

Annual Drinking Water Quality Report

EX. 11 (c)

PONTIAC CORRECTIONAL CENTER

Water Quality Report for the period of January 1 - December 31, 2008

The PONTIAC CORRECTIONAL CENTER is Purchased Ground Water used by water system to provide safe drinking water.

This report is intended to provide you with important information about your drinking water and the efforts made by the water system to provide safe drinking water.

For more information regarding this report contact:

Name: Michael Scholer

Phone: 817-737-6807 X5555

We want our valued customers to be informed about their water quality. If you would like to learn more, please feel welcome to attend any of our regularly scheduled meetings. The source water assessment for our supply has been completed by the Illinois EPA. If you would like a copy of this information, please stop by at http://www.epa.state.il.us/cgi-bin/qv/swap-fact-sheets.pl

## Source of Drinking Water

The sources of drinking water (both tap water and bottled water) include rivers, lakes, streams, ponds, reservoirs, springs, and wells. As water travels over the surface of the land or through the ground, it dissolves naturally-occurring minerals and, in some cases, radioactive material, and can pick up substances resulting from the presence of animals or from human activity.

Contaminants that may be present in source water include:

- Microbial contaminants, such as viruses and bacteria, which may come from sewage treatment plants, septic systems, agricultural livestock operations, and wildlife.

- Inorganic contaminants, such as salts and metals, which can be naturally-occurring or result from urban storm water runoff, industrial or domestic wastewater discharges, oil and gas production, mining, or farming.

- Pesticides and herbicides, which may come from a variety of sources such as agriculture, urban storm water runoff, and residential uses.

- Organic chemical contaminants, including synthetic and volatile organic chemicals, which are by-products of industrial processes and petroleum production, and can also come from gas stations, urban storm water runoff, and septic systems.

- Radioactive contaminants, which can be naturally-occurring or be the result of oil and gas production and mining activities.

Drinking water, including bottled water, may reasonably be expected to contain at least small amounts of some contaminants. The presence of contaminants does not necessarily indicate that water poses a health risk. More information about contaminants and potential health effects can be obtained by calling the EPAs Safe Drinking Water Hotline at (800) 426-4791.

In order to ensure that tap water is safe to drink, EPA prescribes regulations which limit the amount of certain contaminants in water provided by public water systems. FDA regulations establish limits for contaminants in bottled water which must provide the same protection for public health.

Some people may be more vulnerable to contaminants in drinking water than the general population. Immuno-compromised persons such as persons with cancer undergoing chemotherapy, persons who have undergone organ transplants, people with HIV/AIDS or other immune system disorders, some elderly, and infants can be particularly at risk from infections. These people should seek advice about drinking water from their health care providers. EPA/CDC guidelines on appropriate means to lessen the risk of infection by Cryptosporidium and other microbial contaminants are available from the Safe Drinking Water Hotline (800-426-4791).

Consumer Confidence Report

EX. 11(d)

Utility Water Information

| Public Water Name | PWSID | Type of Water | Report Status | Location |
|---|---|---|---|---|
| Public Water System | FF IL1970250 TF08 | GW | | |

Page 61 of 87

Source Water Assessment

EX. 1 (e)

Based on information obtained in a Well Site Survey published in 1987 by the Illinois EPA, three potential sources or possible problem sites were identified within the survey area of Crest Hill's wells. Furthermore, information provided by the Leaking Underground Storage Tank Section of the Illinois EPA has identified several additional sites with ongoing remediations which may be of concern. The Illinois EPA has determined that the Crest Hill's wells #4, #6 and #7 source water is not susceptible to contamination. However, the source water obtained from wells #1, #6, and #7 is susceptible to contamination. This Assessment is based on a number of criteria including: monitoring conducted at the wells; monitoring conducted at the entry point to the distribution system, and the available hydrogeologic data on the well.

# Regulated Contaminants Detected in 2002 (collected in 2002 unless noted)

EX. 12

Date Printed 42 [...]

## Coliform Bacteria

| Coliform Bacteria Maximum Contaminant Level Goal (MCLG) | Total Coliform Maximum Contaminant Level | Highest No. of Positive Total Coliform Samples in any month | Fecal Coliform or E. Coli Maximum Contaminant Level | Total No. of Positive E. Coli or Fecal Coliform Samples in 2002 | Violation? | Likely Source of Contamination |
|---|---|---|---|---|---|---|
| 0 | 1 positive monthly sample | 1 | Fecal Coliform or E. Coli MCL: A routine sample and a repeat sample are total coliform positive, and one is also fecal coliform or... | 0 | Yes | Naturally present in the environment |

## Lead and Copper

Date Sampled: 9/30/2002

| Lead and Copper | MCLG | Contaminant Action Level (AL) | Lead 90th Percentile | # Sites Over Lead AL | Copper Action Level (AL) | Copper 90th Percentile | # Sites Over Copper AL | Violation? | Likely Source of Contamination |
|---|---|---|---|---|---|---|---|---|---|
| Lead [A] | 0 | 15 ppb | 6 ppb | 0 | | | | | Corrosion of household plumbing systems; Erosion of natural deposits |
| Copper | 1.3 ppm | | | | 13 ppm | 1.3 ppm | 0 | No | |

## Regulated Contaminants

| Inorganic Contaminants | Highest Level Detected | Range of Levels Detected | Unit of Measurement | MCLG | MCL | Violation? | Likely Source Of Contaminant |
|---|---|---|---|---|---|---|---|
| Barium | 2/4/1999 — 0.036 | 0.033–0.036 | ppm | 2 | 2 | No | Discharge of drilling wastes; Discharge from metal refineries; Erosion of natural deposits |
| Fluoride | 11/20/2001 — 1.39 | 1.32–1.39 | ppm | 4 | 4 | No | Erosion of natural deposits; Water additive which promotes strong teeth; Discharge... |
| Radioactive Value | 0.29 | Not Applicable | ppm | 10 | 10 | No | Runoff from fertilizer use; Leaching from septic tanks, sewage; Erosion of natural deposits |
| **Radioactive Contaminants** | | | | | | | |
| Alpha Emitters | 13 | 10–13 | pCil | 0 | 15 | No | Erosion of natural deposits |
| **State Regulated Contaminants** | | | | | | | |
| Sodium | 2/8/1999 — 77 | 58–77 | ppm | n/a | n/a | No | Erosion of naturally occurring deposits; used in water softener regeneration |

Note: The state requires monitoring of certain contaminants less than once per year because the concentrations of these contaminants do not change frequently. Therefore, some of this data may be more than one year old.

MCL (Maximum Contaminant Level): The highest level of a contaminant that is allowed in drinking water. MCLs are set as close to the MCLGs as feasible using the best available treatment technology. MCLG (Maximum Contaminant Level Goal): The level of a contaminant in drinking water below which there is no known or expected risk to health. MCLGs allow for a margin of safety. AL (Action Level): The concentration of a contaminant which, if exceeded, triggers treatment or other requirements which a water s...

There is no state standard for sodium. Monitoring is required to provide information to consumers and health officials that are concerned about sodium intake due to dietary precautions. If you are on a sodium-restricted diet, you should consult... This level of sodium is not a state MCL for sodium. However, the state has set an MCL for this contaminant for supplies serving a population of 1000 or more.

## STATEVILLE CORRECTIONAL CENTER has taken the following actions specific to the violations listed above:

As a means of resolving the violation, the Stateville Correctional Center is currently completely upgrading the water main system throughout the facility. IEPA # 1034FY 2003, the project will include blending equipment for blending water from the city of Crest Hill at approximately 68.75% with deep well & 0 31.25%, this project is expected to be completed by November 2003. The Stateville Correctional Center [ppm: parts per million] will be conducting quarterly monitoring.

## 2002 Violation Summary Table:

This table is intended to assist you in the identification of year 2002 violation(s) that are required to be reported and explained in your CCR. The table does NOT include the required explanation of the noted violation(s) and you will need to provide this information as explained in the CCR Guidance Manual.

| Date of contaminant | Violation Type | Violation Duration |
|---|---|---|
| RADIUM COMBINED (226) | MCL, AVERAGE, WITHOUT NO EXCEEDANCE | 10/1/2002 To Ongoing |
| RADIUM COMBINED (226) | MCL, AVERAGE, WITHOUT NO EXCEEDANCE | 9/1/2002 To 9/30/2002 |

Health Effects: Some people who drink water containing radium 226 or 228 in excess of the MCL over many years may have an increased risk of getting cancer.

Health Effects: Some people who drink water containing radium 226 or 228 in excess of the MCL over many years may have an increased risk of getting cancer.

# Consumer Confidence Report

## Annual Drinking Water Quality Report

CREST HILL

IL1970250

For more information regarding this report contact:

This report is intended to provide you with important information about your drinking water and the efforts made by the water system to provide safe drinking water.

The source of drinking water used by CREST HILL is Ground Water

Name  Mr. John Roberts

Phone  (815) 723-8671

Annual Water Quality Report for the period of January 1 to December 31, 2008

Este informe contiene información muy importante sobre el agua que usted bebe. Tradúzcalo ó hable con alguien que lo entienda bien.

We want our valued customers to be informed about their water quality. If you would like to learn more, please feel welcome to attend any of our regularly scheduled meetings. The source water assessment for our supply has been completed by the Illinois EPA. If you would like a copy of this information, please stop by City Hall or call our water operator at.

Source Water Susceptibility to Contamination Determination; and documentation/recommendation of Source Water Protection Efforts, you may access the Illinois EPA website at http://www.epa.state.il.us/cgi-bin/wp/swap-fact-sheets.pl.

## Source of Drinking Water

The sources of drinking water (both tap water and bottled water) include rivers, lakes, streams, ponds, reservoirs, springs, and wells. As water travels over the surface of the land or through the ground, it dissolves naturally-occurring minerals and, in some cases, radioactive material, and can pickup substances resulting from the presence of animals or from human activity.

Contaminants that may be present in source water include:

- Microbial contaminants, such as viruses and bacteria, which may come from sewage treatment plants, septic systems, agricultural livestock operations, and wildlife.

- Inorganic contaminants, such as salts and metals, which can be naturally-occurring or result from urban storm water runoff, industrial or domestic wastewater discharges, oil and gas production, mining, or farming.

- Pesticides and herbicides, which may come from a variety of sources such as agriculture, urban storm water runoff, and residential uses.

- Organic chemical contaminants, including synthetic and volatile organic chemicals, which are by-products of industrial processes and petroleum production, and can also come from gas stations, urban storm water runoff, and septic systems.

- Radioactive contaminants, which can be naturally-occurring or be the result of oil and gas production and mining activities.

Drinking water, including bottled water, may reasonably be expected to contain at least small amounts of some contaminants. The presence of contaminants does not necessarily indicate that water poses a health risk. More information about contaminants and potential health effects can be obtained by calling the EPAs Safe Drinking Water Hotline at (800) 426-4791.

In order to ensure that tap water is safe to drink, EPA prescribes regulations which limit the amount of certain contaminants in water provided by public water systems. FDA regulations establish limits for contaminants in bottled water which must provide the same protection for public health.

Some people may be more vulnerable to contaminants in drinking water than the general population. Immuno-compromised persons such as persons with cancer undergoing chemotherapy, persons who have undergone organ transplants, people with HIV/AIDS or other immune system disorders, some elderly and infants can be particularly at risk from infections. These people should seek advice about drinking water from their health care providers. EPA/CDC guidelines on appropriate means to lessen the risk of infection by Cryptosporidium and other microbial contaminants are available from the Safe Drinking Water Hotline (800-426-4791).

RECEIVED
APR 27 2009
EPA/CAS

# Consumer Confidence Report

## Source Water Information

| Source Water Name | Type of Water | Report Status | Location |
|---|---|---|---|
| WELL 1 (20449) | GW | | |
| WELL 1 (20447) | GW | | |
| WELL 10 (01360) COPPER PARK ROSE AMBER | GW | | 2700 FT N OF WELL 7 |
| WELL 11 (01361) | GW | | 700 FT NE OF STATEVILLE N S |
| WELL 7 (20451) | GW | | |
| WELL 8 (01059) GAYLORD ROAD | GW | | AT W ELEVATED TANK |
| WELL 9 (01260) 21215 DIVISION ST | GW | | |

Source Water Assessment

Based on information obtained in a Well Site Survey published in 1987 by the Illinois EPA, three potential sources or possible problem sites were identified within the survey area of Crest Hill's wells. Furthermore, information provided by the leaking Underground Storage Tank Section of the Illinois EPA, indicated several additional sites with ongoing remediations which may be of concern. The Illinois EPA has determined that the Crest Hill's wells #4, #9 and #9 source water is not susceptible to contamination. However, the source water obtained from Wells 1, #5, and #7 is susceptibility to contamination. This determination is based on a number of criteria including: monitoring conducted at the wells; monitoring conducted at the entry point to the distribution system; and the available hydrogeologic data on the well.

2009     Regulated Contaminants Detected

## Coliform Bacteria

| Maximum Contaminant Level (Goal) | Total Coliform Maximum Contaminant Level | Highest No. of Positive | Fecal Coliform or E. Coli Maximum Contaminant Level | Total No. of Positive E. Coli or Fecal Coliform Samples | Violation | Likely Source of Contamination |
|---|---|---|---|---|---|---|
| 0 | 1 positive monthly sample. | 1 | | 0 | N | Naturally present in the environment. |

## Lead and Copper

Definitions:

Action Level: The concentration of a contaminant which, if exceeded, triggers treatment or other requirements which a water system must follow.

---- If present, elevated levels of lead can cause serious health problems, especially for pregnant women and young children. Lead in drinking water is primarily from materials and components associated with service lines and home plumbing. We are responsible for providing high quality drinking water, but we cannot control the variety of materials used in plumbing components. When your water has been sitting for several hours, you can minimize the potential for lead exposure by flushing your tap for 30 seconds to 2 minutes before using water for drinking or cooking. If you are concerned about lead in your water, you may wish to have your water tested. Information on lead in drinking water, testing methods, and steps you can take to minimize exposure is available from the Safe Drinking Water Hotline or at http://www.epa.gov/safewater/lead.----

Action Level Goal (ALG): The level of a contaminant in drinking water below which there is no known or expected risk to health. ALGs allow for a margin of safety.

| Lead and Copper | Date Sampled | MCLG | Action Level (AL) | 90th Percentile | # Sites Over AL | Units | Violation | Likely Source of Contamination |
|---|---|---|---|---|---|---|---|---|
| Copper | | 1.3 | 1.3 | 1.1 | 1 | ppm | N | Erosion of natural deposits; Leaching from wood preservatives; Corrosion of household plumbing systems. |
| Lead | | 0 | 15 | 0 | 0 | ppb | N | Corrosion of household plumbing systems; Erosion of natural deposits. |

## Water Quality Test Results

Definitions:

The following tables contain scientific terms and measures, some of which may require explanation.

Maximum Contaminant Level or MCL: The highest level of a contaminant that is allowed in drinking water. MCLs are set as close to the MCLGs as feasible using the best available treatment technology.

Maximum Contaminant Level Goal or MCLG: The level of a contaminant in drinking water below which there is no known or expected risk to health. MCLGs allow for a margin of safety.

ppm: milligrams per liter or parts per million - or one ounce in 7,350 gallons of water.

02/23/2009   - IL1972050_2008_2009-03-23_09-47-29.PDF

4  of  6

Water Quality Test Results

ppm:    micrograms per liter or parts per Million - or one ounce in 7,350,000 gallons of water.

na:    not applicable.

Avg:    Regulatory compliance with some MCLs are based on running annual average of monthly samples.

Maximum residual disinfectant level or MRDL:    The highest level of a disinfectant allowed in drinking water. There is convincing evidence that addition of a disinfectant is necessary for control of microbial contaminants.

Maximum residual disinfectant level goal or MRDLG:    The level of a drinking water disinfectant below which there is no known or expected risk to health. MRDLGs do not reflect the benefits of the use of disinfectants to control microbial contaminants.

Regulated Contaminants

| Disinfectants and Disinfection By-Products | Collection Date | Highest Level Detected | Range of Levels Detected | MCLG | MCL | Units | Violation | Likely Source of Contamination |
|---|---|---|---|---|---|---|---|---|
| Chloramines | | 1.08 | .01 - 1.08 | MRDLG = 4 | MRDL = 4 | ppm | N | Water additive used to control microbes |
| Haloacetic Acids (HAA5)* | | 1 | 1 - 1 | No goal for the total | 60 | ppb | N | By-product of drinking water chlorination. |

Not all sample results may have been used for calculating the Highest Level Detected because some results may be part of an evaluation to determine where compliance sampling should occur in the future

| Total Trihalomethanes (TTHM) * | | 4 | 4.4 - 4.4 | No goal for the total | 80 | ppb | N | By-product of drinking water chlorination. |

Not all sample results may have been used for calculating the Highest Level Detected because some results may be part of an evaluation to determine where compliance sampling should occur in the future

| Inorganic Contaminants | Collection Date | Highest Level Detected | Range of Levels Detected | MCLG | MCL | Units | Violation | Likely Source of Contamination |
|---|---|---|---|---|---|---|---|---|
| Barium | | .0776 | .0776 - .0776 | 2 | 2 | ppm | N | Discharge of drilling wastes; Discharge from metal refineries; Erosion of natural deposits |
| Fluoride | | .421 | .421 - .421 | 4 | 4.0 | ppm | N | Erosion of natural deposits; Water additive which promotes strong teeth; Discharge from fertilizer and aluminum factories. |
| Iron | | .0599 | .0599 - .0599 | 1 | 1 | ppm | N | Erosion from naturally occurring deposits. |

03/23/2009 - IIL19970250_2008_2009-03-23_09-47-39.PDF

5 of 6

| Contaminant | Collection Date | Highest Level Detected | Range of Levels Detected | MCLG | MCL | Units | Violation | Likely Source of Contamination |
|---|---|---|---|---|---|---|---|---|
| Nitrate (measured as Nitrogen) | | 2.41 | 0 - 2.41 | 10 | 10 | ppm | N | Runoff from fertilizer use; leaching from septic tanks, sewage; Erosion of natural deposits. |
| Sodium | | 28100 | 28100 - 28100 | | | ppm | N | Erosion from naturally occurring deposits; used in water softener regeneration. |
| Radioactive Contaminants | Collection Date | Highest Level Detected | Range of Levels Detected | MCLG | MCL | Units | Violation | Likely Source of Contamination |
| Beta/photon emitters | 05/17/2004 | 5.4 | 5.4 - 5.4 | 0 | 50 | mrem/yr | N | Decay of natural and man-made deposits. |
| Combined Radium 226/228 | 12/10/2006 | 1.2 | 1.2 - 1.2 | 0 | 5 | pCi/L | N | Erosion of natural deposits. |
| Gross alpha excluding radon and uranium | 10/10/2006 | 2 | 2 - 2 | 0 | 15 | pCi/L | N | Erosion of natural deposits. |

| | Collection Date | Highest Level Detected | Range of Levels Detected | MCLG | MCL | Units | Violation | Likely Source of Contamination |
|---|---|---|---|---|---|---|---|---|
| Nitrate [measured as Nitrogen] | | .241 | 0 - .241 | 10 | 10 | ppm | H | Runoff from fertilizer use; Leaching from septic tanks, sewage; Erosion of natural deposits. |
| Sodium | | 28100 | 28100 - 28100 | | | ppm | N | Erosion from naturally occuring deposits; Used in water softener regeneration. |
| Radioactive Contaminants | Collection Date | Highest Level Detected | Range of Levels Detected | MCLG | MCL | Units | Violation | Likely Source of Contamination |
| Beta/photon emitters | 05/17/2004 | 5.4 | 5.4 - 5.4 | 0 | 50 | mrem/yr | N | Decay of natural and man-made deposits. |
| Combined Radium 226/228 | 10/10/2006 | 1.2 | 1.2 - 1.2 | 0 | 5 | pCi/L | N | Erosion of natural deposits. |
| Gross alpha excluding radon and uranium | 10/10/2006 | 2 | 2 - 2 | 0 | 15 | pCi/L | N | Erosion of natural deposits. |

2009   Regulated Contaminants Detected

PX-H-2

Lead and Copper

Definitions:
Action Level Goal (ALG): The level of a contaminant in drinking water below which there is no known or expected risk to health. ALGs allow for a margin of safety.
Action Level (AL): The concentration of a contaminant which, if exceeded, triggers treatment or other requirements which a water system must follow.

Lead and Copper

| | Date Sampled | MCLG | Action Level (AL) | 90th Percentile | # Sites Over AL | Units | Violation | Likely Source of Contamination |
|---|---|---|---|---|---|---|---|---|
| Copper | | 1.3 | 1.3 | 1.99 | 5 | PPM | N | Erosion of natural deposits; Leaching from wood preservatives; Corrosion of household plumbing systems |

Water Quality Test Results

Maximum Contaminant Level Goal or MCLG: The level of a contaminant in drinking water below which there is no known or expected risk to health. MCLGs allow for a margin of safety.

Maximum Contaminant Level or MCL: The highest level of a contaminant that is allowed in drinking water. MCLs are set as close to the MCLGs as feasible using the best available treatment technology.

Maximum residual disinfectant level or MRDL: The level of a drinking water disinfectant below which there is no known or expected risk to health. MRDLs do not reflect the benefits of the use of disinfectants to control microbial contaminants.

Maximum residual disinfectant level or MRDLG: The highest level of a disinfectant allowed in drinking water. There is convincing evidence that addition of a disinfectant is necessary for control of microbial contaminants.

Definitions: The following tables contain scientific terms and measures, some of which may require explanation.

na - micrograms per liter or parts per billion - or one ounce in 7,350,000 gallons of water.

nd - not applicable.

Regulatory compliance with some MCLs are based on running annual average of monthly samples

ppm - milligrams per liter or parts per million - or one ounce in 7,350 gallons of water.

CK#13

...lated Contaminants

| ...infectants and Disinfection By-Products | Collection Date | Highest Level Detected | Range of Levels Detected | MCLG | MCL | Units | Violation | Likely Source of Contamination |
|---|---|---|---|---|---|---|---|---|
| Chlorine | | | | MRDLG = 4 | MRDL = 4 | ppm | N | Water additive used to control microbes |
| Total Trihalomethanes (TThm)* | 08/25/2006 | 1.57 | 0.12 - 1.57 | | | | | |
| | | 1.6 | 1.6 - 1.6 | No goal for the total | 89 | ppb | N | By-product of drinking water chlorination. |

*Not all sample results may have been used for calculating the Highest Level Detected because some results may be part of an evaluation to determine where compliance sampling should occur in the future.

| Radioactive Contaminants | Collection Date | Highest Level Detected | Range of Level Detected | NCLG | MCL | Units | Violation | Likely Source of Contamination |
|---|---|---|---|---|---|---|---|---|
| Combined Radium 226/228 | 04/06/2004 | 12.4 | 11.4 - 12.4 | 0 | 5 | pCi/L | N | Erosion of natural deposits |

(1) Composite sample collected 4/6/04   TP01   (will 4 chlorinated 2/21/06 )

2 samples   TP01 collected 8/18/03
    TP01       "        a/24/03   > result = 12.4 pC/L

(1) Composite sample   4/6/04   TP02   (will 5 chlorinated 2/23/06
    TP02   3/18/03
    TP02   5/13/03    > result   11.4 pCi/L
    TP02   8/16/07

(1) Composite sample   4/6/04   TP03   (will 6 chlorinated 2/24/06
    TP03   5/13/03        > 11.4 pCi/L
    TP03   9/18/03
    TP03   11/24/03

2008    Regulated Contaminants Detected

## ad and Copper

finitions:

tion Level - The concentration of a contaminant which, if exceeded, triggers treatment or other requirements which a water system must follow.
tion Level Goal (MCLG): The level of a contaminant in drinking water below which there is no known or expected risk to health. MCLGs allow for a margin of safety.

| ad and Copper | Date Sampled | MCLG | Action Level (AL) | 90th Percentile | # Sites Over AL | Units | Violation | Likely Source of Contamination |
|---|---|---|---|---|---|---|---|---|
| pper | 05/16/2006 | 1.3 | 1.3 | 1.9 | 3 | ppm | N | Erosion of natural deposits; Leaching from wood preservatives; Corrosion of household plumbing systems |
| ead | 05/16/2006 | 0 | 15 | 7.4 | 1 | ppb | N | Corrosion of household plumbing systems; Erosion of natural deposits. |

## ter Quality Test Results

efinitions:

The following tables contain scientific terms and measures, some of which may require explanation.

aximum Contaminant level or MCL: The highest level of a contaminant that is allowed in drinking water. MCLs are set as close to the MCLGs as feasible using the best available treatment technology.

aximum Contaminant Level Goal or MCLG: The level of a contaminant in drinking water below which there is no known or expected risk to health. MCLGs allow for a margin of safety.

ppm: milligrams per liter or parts per million - or one ounce in 7,350 gallons of water.

ppb: micrograms per liter or parts per billion - or one ounce in 7,350,000 gallons of water.

...: not applicable.

...: Regulatory compliance with some MCLs are based on running annual average of monthly samples.

aximum residual disinfectant level or MRDL: The highest level of a disinfectant allowed in drinking water. There is convincing evidence that addition of a disinfectant is necessary for control of microbial contaminants.

aximum residual disinfectant level or MRDLG: The level of a drinking water disinfectant below which there is no known or expected risk to health. MRDLGs do not reflect the benefits of the use of disinfectants to control microbial contaminants.

## gulated Contaminants

| Disinfectants and Disinfection by-products | Collection Date | Highest Level Detected | Range of Levels Detected | MCLG | MCL | Units | Violation | Likely Source of Contamination |
|---|---|---|---|---|---|---|---|---|
| Chlorine | | 2.55 | .1 - 2.66 | MRDLG = 4 | MRDL = 4 | ppm | N | Water additive used to control microbes. |
| Total Trihalomethanes (TTHM)* | 08/29/2006 | 1.6 | 1.6 - 1.6 | No goal for the total | ----80---- | ppb | N | By-product of drinking water chlorination |

* All sample results may have been used for calculating the Highest Level Detected because some results may be part of an evaluation to determine where compliance sampling should occur in the future

| Radioactive contaminants | Collection Date | Highest Level Detected | Range of Levels Detected | MCLG | MCL | Units | Violation | Likely Source of Contamination |
|---|---|---|---|---|---|---|---|---|
| Beta/photon emitters | 08/18/2003 | 29 | 23 - 29 | 0 | 50 | mrem/yr | N | Decay of natural and man-made deposits |
| Combined Radium 226/228 | 04/06/2004 | 12.4 | 11.4 - 12.4 | 0 | 5 | pCi/L | N | Erosion of natural deposits. |
| Gross alpha excluding radon and uranium | 11/24/2003 | 19 | 17 - 19 | 0 | 15 | pCi/L | N | Erosion of natural deposits. |

 **Environment, Health and Safety Online**

Email this page | Table of contents | Feedback Acronyms Services

*The site for free, objective information you can use!*   Search the site

## Dust Mites: Everything You Might Not Want To Know!



Just thinking of these dust mites living in your pillow by the millions, eating your dead skin and hair is enough to make even Gov. Arnold Schwartznegger sick. The are a major cause of asthma and allergies; especially in vulnerable individuals, such as children and the elderly. According to the American College of Asthma, Allergy & Immunology, approximately 10 percent of Americans exhibit allergic sensitivity to dust mites. In the spring, pollen aggravates allergies, and dustmite infestations make it worse. The Fall and Winter months are a particular problem, as we close up our houses and the concentrations of dust mites and their feces increases inside. And with dustmites at their multiplying peak during warm; wet weather, read on to find out what you can do about dust mites!

*5*

EX. 12(a)

## Regulated Contaminants Detected in 2003 (collected in 2003 unless noted)

### Lead and Copper | Date Sampled: 9/30/2002

| | Lead 90th Percentile | # Sites Over Lead AL | Copper MCLG | Copper Action Level (AL) | Copper 90th Percentile | # Sites Over Copper AL | Unit of Measurement | Violation? | Likely Source Of Contamination |
|---|---|---|---|---|---|---|---|---|---|
| MCLG 0 | Lead 90th Percentile 2 ppb | 0 | 1.3 ppm | 1.3 ppm | .01 ppm | 0 | ppm | | Corrosion of household plumbing systems; Erosion of natural deposits |
| AL 15 ppb | | | | | | | | | |

### Microbiological Contaminants

| | Highest Level Detected | Range of Levels Detected | MCLG | MCL | Violation? | Likely Source Of Contaminant |
|---|---|---|---|---|---|---|
| | | | | | No | Naturally present in the environment |

### Inorganic Contaminants

| | | Highest Level Detected | Range of Levels Detected | Unit of Measurement | MCLG | MCL | Violation? | Likely Source Of Contaminant |
|---|---|---|---|---|---|---|---|---|
| Barium | 2/8/1999 | 0.036 | 0.033-0.036 | ppm | 2 | 2 | No | Discharge of drilling wastes; Discharge from metal refineries; Erosion of natural deposits |
| Fluoride | 11/24/2001 | 1.39 | 1.37-1.39 | ppm | 4 | 4 | No | Erosion of natural deposits; Water additive which promotes strong teeth; Fertilizer discharge |

### Radioactive Contaminants

| | | Highest Level Detected | Range of Levels Detected | Unit of Measurement | MCLG | MCL | Violation? | Likely Source Of Contaminant |
|---|---|---|---|---|---|---|---|---|
| Alpha Emitters | | 11 | 9-11 | pCi/L | 0 | 15 | No | Erosion of natural deposits |
| Radium | | 560 | 240-560 | ppb | 0 | NCO | No | Erosion from naturally occurring deposits |

### State Regulated Contaminants

| | | Highest Level Detected | Range of Levels Detected | Unit of Measurement | MCLG | MCL | Violation? | Likely Source Of Contaminant |
|---|---|---|---|---|---|---|---|---|
| Sodium | 2/8/1999 | 77 | 56-77 | ppm | n/a | n/a | No | Erosion of naturally occurring deposits; used in water softener regeneration |
| Tin | | 290 | Not Applicable | ppb | n/a | 5000 | No | Naturally occurring; discharge from metal refineries |

## 2003 Violation Summary Table:

| Type of Contaminant | Violation Type | Violation Duration |
|---|---|---|
| GROUP COMBINED (226) | MCL AVERAGE WITHOUT NO EXCEEDANCE | 10/1/2003 to 12/31/2003 |
| Some people who drink water containing radium 226 or 228 in excess of the MCL over many years may have an increased risk of getting cancer | | |
| GROUP COMBINED (226) | MCL AVERAGE WITHOUT NO EXCEEDANCE | 7/1/2003 to 9/30/2003 |
| Some people who drink water containing radium 226 or 228 in excess of the MCL over many years may have an increased risk of getting cancer | | |
| GROUP COMBINED (226) | MCL AVERAGE WITHOUT NO EXCEEDANCE | 4/1/2003 to 6/30/2003 |
| Some people who drink water containing radium 226 or 228 in excess of the MCL over many years may have an increased risk of getting cancer | | |
| RADIUM COMBINED (226) | MCL AVERAGE WITHOUT NO EXCEEDANCE | 1/1/2003 to 3/31/2003 |
| Some people who drink water containing radium 226 or 228 in excess of the MCL over many years may have an increased risk of getting cancer | | |

EX. 12 (6)

| 4/22/2002 | 38 | 15 - 38 | 0 | 4 | mR/Yr | No | Erosion of natural deposits |
|---|---|---|---|---|---|---|---|

**Note:** The state requires monitoring of certain contaminants less than once per year because the concentrations of these contaminants do not change frequently. Therefore, some of this data ... more than one year old. MCL (Maximum Contaminant Level): The highest level of a contaminant that is allowed in drinking water. MCLs are set as close to the MCLGs as feasible using the best available treatment technology. MCLG (Maximum Contaminant Level Goal): The level of a contaminant in drinking water below which there is no known or expected risk to health. MCLGs allow... margin of safety. AL (Action Level): The concentration of a contaminant which, if exceeded, triggers treatment or other requirements which a water system must follow. ppm: parts per million... ppb: parts per billion, ppt: parts per trillion pCi/l: picoCuries per liter (measurement of radioactivity)

## 2004 Violation Summary Table:

This table is intended to assist you in the identification of year 2004 violation(s) that are required to be reported and explained in your CCR. The table does NOT include the required explanation. The listed violation(s) and you will need to provide this information as explained in the CCR Guidance Manual.

| Rule or Contaminant | Violation Type | Violation Duration |
|---|---|---|
| GROSS ALPHA PARTICLE ACTIVITY, TOTAL<br>Certain minerals are radioactive and may emit a form of radiation known as alpha radiation. Some people who drink water containing alpha emitters in excess of the MCL over many years may have an increased risk of cancer. | | |
| GROSS ALPHA, INCLDNG RA, EXCLDNG RN & U | MCL, AVERAGE, WITHOUT NO. EXCEEDANCE | 1/1/2004 To 3/31/2004 |
| | MONITORING, ROUTINE MAJOR | 7/1/2004 To 9/30/2004 |
| RADIUM, COMBINED (226, 228)<br>Some people who drink water containing radium 226 or 228 in excess of the MCL over many years may have an increased risk of getting cancer. | MCL, AVERAGE, WITHOUT NO. | 1/1/2004 To 3/31/2004 |
| RADIUM, COMBINED (226, 228)<br>Some people who drink water containing radium 226 or 228 in excess of the MCL over many years may have an increased risk of getting cancer. | MCL, AVERAGE, WITHOUT NO. EXCEEDANCE | 10/1/2004 To 12/31/2004 |
| RADIUM, COMBINED (226, 228)<br>Some people who drink water containing radium 226 or 228 in excess of the MCL over many years may have an increased risk of getting cancer. | MCL, AVERAGE, WITHOUT NO. EXCEEDANCE | 4/1/2004 To 6/30/2004 |
| RADIUM, COMBINED (226, 228)<br>... to collect the required number of samples. | MCL, AVERAGE, WITHOUT NO. | 7/1/2004 To 9/30/2004 |
| RADIUM, COMBINED<br>... to collect the required number of samples. | MONITORING, ROUTINE MAJOR | 7/1/2004 To 9/30/2004 |
| | MONITORING, ROUTINE MAJOR | 7/1/2004 To 9/31/2004 |

JOLIET CORRECTIONAL CENTER has taken the following actions specific to the VIOLATION(S) listed above:

...s a means of resolving the violations listed above, the Joliet Correctional Center has completed the new ion xchange water treatment plant. IEPA permit # 1388FY2003. All testing has been completed and the plant as put on the line in July of 2004. All subsequent quarterly monitoring for radioactive contaminants have een with in allowable levels.

# 2004 Regulated Contaminants Detected

Ex. 12 (c)

Lead and Copper
Date Sampled: 12/31/2004
Definitions:

Action Level (AL): The concentration of a contaminant which, if exceeded, triggers treatment or other requirements which a water system must follow.
Action Level Goal (ALG): The level of a contaminant in drinking water below which there is no known or expected risk to health. ALG's allow for a margin of safety.

| Lead MCLG | Lead Action Level (AL) | Lead 90th Percentile | # Sites Over Lead AL | Copper MCLG | Copper Action Level (AL) | Copper 90th Percentile | # Sites Over Copper AL | Likely Source of Contamination |
|---|---|---|---|---|---|---|---|---|
| 0 | 15 ppb | 7.4 ppb | 1 | 1.3 ppm | 1.3 ppm | 0.28 ppm | 0 | Corrosion of household plumbing systems; Erosion of natural deposits |

## Water Quality Test Results

Definitions: The following tables contain scientific terms and measures, some of which may require explanation.

Maximum Contaminant Level (MCL): The highest level of a contaminant that is allowed in drinking water. MCL's are set as close to the Maximum Contaminant Level Goal as feasible using the best available treatment technology.

Maximum Contaminant Level Goal (MCLG): The level of a contaminant in drinking water below which there is no known or expected risk to health. MCLG's allow for a margin of safety.

ppm: milligrams per litre or parts per million - or one ounce in 7,350 gallons of water.
ppb: micrograms per litre or parts per billion - or one ounce in 7,350,000 gallons of water.
na: not applicable.

avg: Regulatory compliance with some MCLs are based on running annual average of monthly samples.
Maximum Residual Disinfectant Level (MRDL): The highest level of disinfectant allowed in drinking water.
Maximum Residual Disinfectant Level Goal (MRDLG): The level of disinfectant in drinking water below which there is no known or expected risk to health. MRDLG's allow for a margin of safety.

## Regulated Contaminants

| Disinfectants & Disinfection By-Products | Collection Date | Highest Level Detected | Range of Levels Detected | MCLG | MCL | Units | Violation | Likely Source of Contaminant |
|---|---|---|---|---|---|---|---|---|
| Chlorine | 10/7/1999 | 0.7967 | 0 - 0.7967 | MRDLG=4 | MRDL=4 | ppm | | Water additive used to control microbes |

| Inorganic Contaminants | Collection Date | Highest Level Detected | Range of Levels Detected | MCLG | MCL | Units | Violation | Likely Source of Contaminant |
|---|---|---|---|---|---|---|---|---|
| Nitrate | 10/7/1999 | 1.39 | 1.31 - 1.39 | 4 | 4 | ppm | No | Erosion of natural deposits; Water additive which promotes strong teeth; Fertilizer discharge |
| Nitrate-Nitrite | 6/15/2004 | 0.21 | 0.2 - 0.21 | 10 | 10 | ppm | No | Runoff from fertilizer use; Leaching from septic tanks, sewage; Erosion of natural deposits |
| Nitrate (As N) | 6/15/2004 | 0.21 | 0.2 - 0.21 | 10 | 10 | ppm | No | Runoff from fertilizer use; Leaching from septic tanks, sewage; Erosion of natural deposits |

| Radioactive Contaminants | Collection Date | Highest Level Detected | Range of Levels Detected | MCLG | MCL | Units | Violation | Likely Source of Contaminant |
|---|---|---|---|---|---|---|---|---|
| Combined Uranium | 6/2/2004 | 0.4 | 0.32 - 0.4 | 0 | 30 | ppb | No | Erosion of natural deposits |
| Alpha Emitters | 3/8/2004 | 10 | 6 - 10 | 0 | 15 | pCi/L | Yes | Erosion of natural deposits |
| Alpha Emitters (Adjusted) | 3/8/2004 | 9.64 | 5.63 - 9.64 | 0 | 15 | pCi/L | No | Erosion of natural deposits |
| Combined Radium | 3/8/2004 | 15.3 | 4 - 15.3 | 0 | 5 | pCi/L | | Erosion of natural deposits |

http://appdata.epa.state.il.us/water/bowccr/ccrdoc.aspx?UName=IL1077030

# ILLINOIS ENVIRONMENTAL PROTECTION AGENCY

1021 North Grand Avenue East, P.O. Box 19276, Springfield, Illinois 62794-9276 • (217) 782-2829
James R. Thompson Center, 100 West Randolph, Suite 11-300, Chicago, IL 60601 • (312) 814-6026

PAT QUINN, GOVERNOR          DOUGLAS P. SCOTT, DIRECTOR

1/12/2010

Phone: 217/782-8482
Fax:    217/782-9891
Email: foia@illinois.gov

4

Stateville Correctional Center
PO Box 112
Joliet, IL  60434-

RE: Freedom of Information Act (FOIA) Request /FOIA Files
Stateville Correctional Center, IL

Dear

The FOIA Sector, Bureau of Water, has processed your FOIA request **2010-0061** dated 1/6/2010 for public records pursuant to the Freedom of Information Act ("FOIA") (5 ILCS 140/1 et. Seq. Information regarding the subject of your request, as referenced above, is enclosed.

Please contact me at the above referenced number, if you require further assistance.

Sincerely,

Janet Christer
FOIA Coordinator
Bureau of Water
Enclosure

cc: File

Rockford • 4302 N. Main St., Rockford, IL 61103 • (815) 987-7760
Elgin • 595 S. State, Elgin, IL 60123 • (847) 608-3131
Bureau of Land – Peoria • 7620 N. University St., Peoria, IL 61614 • (309) 693-5462
Collinsville • 2009 Mall Street, Collinsville, IL 62234 • (618) 346-5120

Des Plaines • 9511 W. Harrison St., Des Plaines, IL 60016 • (847) 294-4000
Peoria • 5415 N. University St., Peoria, IL 61614 • (309) 693-5463
Champaign • 2125 S. First St., Champaign, IL 61820 • (217) 278-5800
Marion • 2309 W. Main St., Suite 116, Marion, IL 62959 • (618) 993-7200

Ex. 13 (a)

# ATTACHMENT "A"
# VIOLATIONS AND DEFICIENCIES

The current evaluation of your community water supply indicates that the following conditions appear to violate Title IV of the Illinois Environmental Protection Act 415 ILCS 5/1-57.17 (1999) (The Act), 35 Illinois Administrative Code (35 IAC), the Recommended Standards for Water Works (1982) (Standards) and related standards. A written response outlining corrective action is required to be submitted to this office within 45 days.

**1) Administrative / Managerial Capacity– Monthly Operating Reports not Submitted:**

During the past year the required monthly operating reports have not been received by this office. The prepared reports must be reviewed and signed by the "Certified Operator in Responsible Charge". A supply of report forms is available from this office on request. The completed reports must include daily water usage, calculated and measured chlorine residuals and submitted to this ..... within 30 days after the end of each month.

**(The Environmental Protection Act, Section 19; and 35 IAC 611.831)**

**2) Administrative/Managerial Capacity – Cross-Connection Control Program Deficiency**

Stateville Correctional Center does not have a cross connection control program approved by the Illinois EPA. It is acknowledged that Stateville adopted a Cross Connection and backflow protection policy, or Standard Operating Procedure, and administers part of the cross connection control program requirements. However, the following requirement of the cross-connection program is need to be completed:

a) Please send a copy of the cross-connection control policy or SOP and an outline of the cross-connection control program to Dave McMillan, IEPA-BOW-PWS-FOS, 1021 North Grand Avenue East, P.O. Box 19276, Springfield, IL 62794-9276 for Illinois EPA approval.

b) Stateville must monitor and perform annual testing of all in-house backflow devices. As part of the cross-connection program requirement, Stateville must assure that all the backflow devices are tested on an annual basis by a licensed plumber who holds a Cross Connection Control Device Inspection certificate. RPZ backflow devices must be tested annually, and Stateville must maintain records of all tests and locations of all RPZ type backflow devices. Please note that Correctional ..... who have a licensed plumber on staff may have them become certified for these annual ..... and inspections to reduce costs and the necessity for external contractors to enter the facilities.

Correct the above cross-connection deficiencies to comply with the provisions of cross-connection control program requirements.

**(The Act, Section 18, 35 IAC, Sections 653.801 and 653.802)**

SECURITY SENSITIVE

EX. 13 (b)

## ATTACHMENT "B"
## REMINDERS AND RECOMMENDATIONS

1) Administrative/Managerial – Lead and Copper Rule Sampling and Reporting Reminders:

Based on the State Drinking Water Information System (SDWIS), copper samples collected in April 2005, November 2005 and May 2006 showed 70%, 85% and 80% compliance of Action Level (AL). Based on copper standards, a minimum of 90% of the samples must not exceed the action level of 1.3 mg/l.

Illinois EPA issued a non-compliance advisory (NCA) to Stateville in 2005 to address the exceedance of copper action level. Stateville's compliance agreement was approved by IEPA in January 2007. As part of the compliance agreement, Crest Hill (seller) added polyphosphate to achieve optimal corrosion control treatment (OCCT). In the first two years while polyphosphate is being added, Stateville is required to submit water quality parameter reports (WQPR) for CC05 to determine the effectiveness of polyphosphate addition. After two years of polyphosphate addition, Stateville will also collect follow-up lead and copper samples to ensure corrosion control is maximized and working properly.

We like to remind that timely collection of samples and submittal of WQPR are required to comply with all provisions of Lead and Copper Rule. When you receive sample bottles, please perform the required lead and copper sampling and submit WQPR's to our compliance section in Springfield. If you have any questions or concerns regarding the lead and copper or water quality parameter sampling, please contact Jay Timm of our Compliance Assurance Section at phone number 217-785-0561 for guidance.

2) Technical Capacity – Isolate the softener (TP04) to prevent stagnant or contaminated Water Entering the Distribution:

The Supply has a water softener which is currently not being used. Stagnant water and/or unused filter media inside the softener allow bacteria breeding. Please drain any water from the softener vessel and remove filter media while the softener is on stand-by. Pressure wash the softener vessel, add new filter media, waste some water and obtain satisfactory finished water coliform analysis from samples collected at least 24 hours apart before allowing the softener to be placed into service. If there is no use for the softener, it needs to be physically disconnected from the system.

SECURITY SENSITIVE



ILLINOIS ENVIRONMENTAL PROTECTION AGENCY

1021 North Grand Avenue East • P.O. Box 19276, Springfield, Illinois 62794-9276 • (217) 782-3397
James R. Thompson Center, 100 West Randolph, Suite 11-300, Chicago, IL 60601 • (312) 814-6026

ROD R. BLAGOJEVICH, GOVERNOR          DOUGLAS P. SCOTT, DIRECTOR

EX. 14

847-608-3131
FAX: 847-608-3139

May 8, 2008

Stateville Correctional Center Public Water Supply
c/o Mr. Terry McCann, Warden
P.O. Box 112
Joliet, IL 60434

Re:    Stateville Correctional Center – IL1977910
       2008 Public Water Supply Inspection Report

Dear Mr. McCann:

An engineering evaluation of the **Stateville Correctional Center** community water supply has
been completed. A field inspection was made on April 22, 2008 by Mr. Shibu Vazha of this
office. Mr. Ralph Snider and Mr. William Weilding were present during this inspection.

The Illinois Environmental Protection Agency conducts periodic inspections of all community
water supplies to determine if their ongoing programs for monitoring, maintaining the water
supply, and providing appropriate information to the water users meet the requirements of the
Illinois Pollution Control Board's public water supply regulations and related standards. The
reason for this work is that if the people in a community are to cooperate and use a common
water supply, they must feel that their system is properly constructed, operated and main-
tained.

Aspects of the water system that may not comply with current standards or regulatory
requirements are detailed in attachment "A" of this letter. <u>Please respond to these findings in
writing within 45 days.</u> Your response should describe the steps that have been, or will be
taken, including, and an estimated date of completion to correct these deficiencies.

This letter is NOT a violation notice as specified in Section 31(a)(1) of the Illinois
Environmental Protection Act (415 ILCS 5/31(a)(1). However, if an appropriate response is
not received within 45 days, the Illinois Environmental Protection Agency may issue a formal
violation notice pursuant to Section 31(a)(1) of the Act.

RECEIVED

JUN 1 2 2008

DIVISION OF PUBLIC WATER SUPPLIES
ILLINOIS ENVIRONMENTAL PROTECTION AGENCY

ROCKFORD – 4302 North Main Street, Rockford, IL 61103 – (815) 987-7760   •   DES PLAINES – 9511 W. Harrison St., Des Plaines, IL 60016 – (847) 294-4000
ELGIN – 595 South State, Elgin, IL 60123 – (847) 608-3131   •   PEORIA – 5415 N. University St., Peoria, IL 61614 – (309) 693-5463
BUREAU OF LAND – Peoria – 7620 N. University St., Peoria, IL 61614 – (309) 693-5462   •   CHAMPAIGN – 2125 South First Street, Champaign, IL 61820 – (217) 278-5800
SPRINGFIELD – 4500 S. Sixth Street Rd., Springfield, IL 62706 – (217) 786-6892   •   COLLINSVILLE – 2009 Mall Street, Collinsville, IL 62234 – (618) 346-5120
MARION – 2309 W. Main St., Suite 116, Marion, IL 62959 – (618) 993-7200

PRINTED ON RECYCLED PAPER

EX. 14 (a)                                                    EX # 4

May 6, 2008

The Illinois Pollution Control Board Regulations can be downloaded from the internet at www.ipcb.state.il.us. The *Recommended Standards for Water Works* is available from Health Education Services, P.O. Box 7126, Albany, New York, 12224. (Phone 518-439-7286 / FAX 518-439-7022). This document may also be purchased through the internet at *www.hes.org*

We also request that you review the enclosed "Public Water Supply Data Sheets". Monitoring requirements are determined by the information included on these data sheets, making it vital that you inform us of any errors or other inaccuracies.

We appreciate the cooperation and courtesy extended during this survey. Questions or comments regarding this evaluation should be directed to **Mr. Shibu Vazha** at 847-608-3137.

Sincerely,

_____

Brett Hanson
Regional Manager
Division of Public Water Supplies
Illinois Environmental Protection Agency


Shibu Vazha
Environmental Engineer


cc:     Michael Studer, Water Supply Operator
        William Weilding, Chief Engineer
        Will County Health Department
        Illinois State Water Survey

EX. 14 (b)



# Annual Drinking Water Quality Report

CREST HILL

IL1970250

**Annual Water Quality Report for the period of January 1 to December 31, 2007**

This report is intended to provide you with important information about your drinking water and the efforts made by the CREST HILL water system to provide safe drinking water. The source of drinking water used by CREST HILL is Ground Water.

For more information regarding this report contact:

Name  John Roberts

Phone  815 723·8671

Este Informe contiene información muy importante sobre el agua que usted bebe. Traduzcalo ó hable con alguien que lo entienda bien.

| Source of Drinking Water |
|---|
| The sources of drinking water (both tap water and bottled water) include rivers, lakes, streams, ponds, reservoirs, springs, and groundwater wells. As water travels over the surface of the land or through the ground, it dissolves naturally-occurring minerals and, in some cases, radioactive material, and can pickup substances resulting from the presence of animals or from human activity. |
| Contaminants that may be present in source water include: |
| Microbial contaminants, such as viruses and bacteria, which may come from sewage treatment plants, septic systems, agricultural livestock operations and wildlife. |
| Inorganic contaminants, such as salts and metals, which can be naturally occurring or result from urban storm water runoff, |
| Industrial, or domestic wastewater discharges, oil and gas production, mining, or farming. |
| Pesticides and herbicides, which may come from a variety of sources such as agriculture, urban storm water runoff, and residential uses. |
| Organic chemical contaminants, including synthetic and volatile organic chemicals, which are by-products of industrial processes and petroleum production, and can also come from gas stations, urban storm water runoff, and septic systems. |
| Radioactive contaminants, which can be naturally-occurring or be the result of oil and gas production and mining activities. |

Drinking water, including bottled water, may reasonably be expected to contain at least small amounts of some contaminants. The presence of contaminants does not necessarily indicate that water poses a health risk. More information about contaminants and potential health effects can be obtained by calling the EPA's Safe Drinking Water Hotline at (800) 426-4791.

In order to ensure that tap water is safe to drink, EPA prescribes regulations which limit the amount of certain contaminants in water provided by public water systems. FDA regulations establish limits for contaminants in bottled water which must provide the same protection for public health.

Some people may be more vulnerable to contaminants in drinking water than the general population. Immuno-compromised persons such as persons with cancer undergoing chemotherapy, persons who have undergone organ transplants, people with HIV/AIDS or other immune system disorders, some elderly and infants can be particularly at risk from infections. These people should seek advice about drinking water from their health care providers. EPA/CDC guidelines on appropriate means to lessen the risk of infection by Cryptosporidium and other microbial contaminants are available from the Safe Drinking Water Hotline (800-426-4791).

## Source Water Assessment

A Source Water Assessment summary is included below for your convenience.

Based on information obtained in a Well Site Survey published in 1987 by the Illinois EPA, three potential sources or possible problem sites were identified within the survey area of Crest Hill's wells. Furthermore, information provided by the Leaking Underground Storage Tank Section of the Illinois EPA indicated several additional sites with ongoing remediations which may be of concern. The Illinois EPA has determined that the Crest Hill's wells #4, #8 and #9 source water is not susceptible to contamination. However, the source water obtained from Wells 1, #6, and #7 is susceptibility to contamination. This determination is based on a number of criteria including; monitoring conducted at the well, monitoring conducted at the entry point to the distribution system; and the available hydrogeologic data on the well. The Illinois Environmental Protection Act provides minimum protection zone of 400 feet for Crest Hill wells #1,#6, and #7 and 200 feet for well #4, #8 and #9. These minimum protection zones are regulated by the Illinois EPA. To further minimize the risk to the groundwater supply, the Illinois EPA recommends that six additional activities be assessed. First, the city should obtain aquifer property data and groundwater flow direction information so the recharge area for the cities Wells #1, #6 and #7 can be mapped. This information can be obtained by completing pump tests on the CWS wells and completing mass water level measurements on wells finished in the aquifer utilized by Wells #1, #6 and #7. Upon completing this effort, the city may wish to enact a "maximum setback zone" ordinance(s) to further protect their water supply. These ordinances are authorized by the Illinois Environmental Protection Act and allow county and municipal officials the opportunity to provide additional protection up to a fixed distance, normally 1,000 feet, from their wells. Third, the water supply staff may wish to revisit their contingency planning documents. Contingency planning documents are a primary means to ensure that, through emergency preparedness, a city will minimize their risk of being without safe and adequate water. Fourth, the water supply staff is encouraged to review their cross connection control program to ensure that it remains current and viable. Cross connections to either the water treatment plant (for example, at bulk water loading stations) or in the distribution system may negate all source water protection initiatives provided by the city. Fifth, the city should explore the options of either properly abandoning the inactive Wells #10 and #11 or retrofitting them for active use as a source of water supply. Inactive wells that are not properly abandoned can act as direct conduits for surficial contaminants into the aquifer and are considered "routes" under the Illinois Environmental Protection Act. Finally, the Illinois EPA recommends that the city investigate additional source water protection management options to address land use activities within the recharge areas of Wells #1, #6 and #7. Specifically, these management options must include potential impacts from point and nonpoint sources of groundwater contamination.

EX. 15

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

_____Stateville_____ Center

Offender Information:

_Montague_ _____ ID#: N62212

Last Name / First Name / MI

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 1/18/15 | **Nurse / CMT Tx Protocol: Cough** | MDUC 1-31-15 |
| 0810· | **S.** I have a constant cough | **P. Prompt MD/PA/NP Referral (call physician directions if not on site) if: Note: generally these patients need a stat chest** |
| | - Duration X 4 mos | - Fever greater than 100 degrees ∅ |
| | - Productive or non-productive cough? If productive, amount and color of sputum. | - Severe headache denies |
| | - Other associated symptoms (congested or runny nose, stiff neck, headache, fever, earache, sore throat, SOB, chills, diaphoretic, wheezing, tightness in chest, chest pain) | - Stiff neck denies able to do chin to chest c̄ ease |
| | - Any history of asthma, allergies, cigarette smoking or heat problems? ⊗ | - SOB @ times - worse early AM |
| | - Any medical problems? On any medications (ACE inhibitors frequently cause cough)? denies | - Hemoptysis denies |
| | - Any allergies to food, medication or environmental agents? NKDA denies other allergies | - Cervical lymph node enlargement ∅ |
| **O.** | - Weight loss, fever, blood in sputum, associated night sweats. | - Night sweats ↑ RR c̄ coughing |
| | TPR 98/74/18 BP 139/96 Wt. 200 | - Weight loss denies |
| | - Listen to lung sounds congestion - clears c̄ cough | - Diminished breath sounds ∅ |
| | - Examine throat, nasal passages and ear canals Clear, WRL | - Pain with cough ∅ denies |
| | - Skin color: pink, mottled, cyanotic, gray, pale, flushed? Tan-brown | - Cough unresolved after protocol implemented x 3 days ∅ |
| | - Skin temperature: warm, hot, cool, clammy, dry? | - Cough with night sweats, hemoptysis, or weight loss should also result in isolation procedures if patient is not ordered off site by physician. |
| | | |
| | Continue on next page: | |

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

Printed on Recycled Paper

Ex. 15b.

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

Stateville Correctional Center

D333

| Offender Information: | | |
|---|---|---|
| MONTAGUE<br>Last Name | RAMON<br>First Name | ___ MI    ID#: N62212 |

| Date/Time | Cnr note: Subjective, Objective, Assessment | Plans |
|---|---|---|
| 7/11/15<br>11⁵⁰ pm | S. "I've been shaking since (½) hr my body is aching and also feeling sick." | 1. Tab. Tylenol 325mg P.O. TID X PRN. |
| | | 2. ↑ fluids. |
| | O. A&O X3, resting in bed and | 3. Bed rest. |
| VITALS | appears in mild distress. Last | 4. To recheck |
| BP-120/80 | seen by MD in May 2015 for | condition after |
| P-100/min | flu c oncology. | 2 hrs. |
| R-20/min | Abd: soft, Ø rigidity. BM & BS + | 5. Notified |
| T-99.9°F | Heart: Regular, Rhythmic, mild | U.C./Lead nurse |
| | tachycardia noted. | of the same. |
| | Lungs: Clear, Ø SOB. | |
| | No any other complaints except | |
| | for bodyaches & chills. | |
| | A. Bodyaches & chills. | [signature] |

Printed on Recycled Paper

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

EX. 16

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

**Stateville Correctional Center**

Offender Information:

Last Name: Montague   First Name: Ramon   MI: ___   ID#: N 62212

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 3/26/15 1:05 pm | MD NOTE | |
| B/P 142/84 | ① Cough x last 2 months | |
| HR 91 | ② Lump in his testicle | |
| RR 18 | ③ Colon ca survivor, inquiring about F/u | |
| Temp 98.6 | O > ∅ TPC | |
| Wt: 200 | Lungs clear, RRR, ∅ S3 | |
| | Abd soft, NABS | |
| | ⊕ papular mass Ⓛ scrotum — no | |
| | testicular masses or ing. LN | |
| | A > Cough | |
| | Papule / sebaceous cyst Ⓛ scrotum | |
| | Colon ca  S/p colectomy | |
| | P > Keflex 500 mg BID × 7 days | |
| | Throat lozenges # 24 | |
| | UIC Oncology F/u per note dated 2/6/2014 | |
| | (in Miscellaneous) — to see Dr Obaisi | |
| | CBC, CMP, CEA — ordered   A Martija M.D. | |

Printed on Recycled Paper

DOC 0084 (Eff. 9/2002)
(Replaces DC 7X)

IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RAMON MONTAGUE
Plaintiff/Petitioner                    )
                                        )
                                        )
            Vs.                         )          No. _____
                                        )
TERRY WILLIAMS, MICHEAL LEMKE           )
Defendant/Respondent          etc...    )

## PROOF/CERTIFICATE OF SERVICE

TO: Clerk of U.S. District Court          TO: Lisa Madigan
United States Courthouse                  Attorney General
219 S. Dearborn St.                       100 W. Randolph St.
Chicago, Illinois 60604                   Chicago, Il. 60601

PLEASE TAKE NOTICE that on February 1, , 20 16 , I placed the
attached or enclosed documents in the institutional mail at STATEVILLE C. C.
Correctional Center, properly addressed to the parties listed above for mailing through
the United States Postal Service.

DATED: 2 - 1 - 16

                                /s/ Ramon Montague
                                NAME: RAMON Montague
                                I.D.O.C.#: N62212
                                Joliet Stateville Correctional Center
                                P.O. Box: 112
                                Joliet            ,IL 60434

Subscribed and sworn to before me this 1st day of FEB , 20 16 .


Notary Public

OFFICIAL SEAL
TYNEER BUTLER-WINTERS
Notary Public, State of Illinois
My Commission Expires 3/17/2019